THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES L. THOMPSON, Defendant-Appellant.

First District (5th Division)   No. 76-921

Opinion filed January 27, 1978.

Nathaniel R. Howse, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Iris E. Sholder, and James M. Thunder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant, James L. Thompson, was charged with rape, two counts of indecent liberties with a child (deviate sexual conduct and sexual intercourse), aggravated kidnapping, and unlawful restraint for his actions with respect to a 12-year-old girl. In a bench trial, defendant was found guilty of rape and one count of indecent liberties with a child (sexual intercourse) and was sentenced to concurrent terms of four to six years on each count. On appeal defendant contends that the evidence is insufficient to support either conviction, that the trial court erred in allowing the recall of a witness, and that he may not be convicted of rape and indecent liberties where both offenses arose from the same conduct. We affirm in part and reverse and vacate in part. The pertinent facts follow.

The minor victim testified that on February 9, 1975, the date of the occurrence, she was 12 years old. She had been visiting two of her cousins at their house that day, and at approximately 8 p.m. one of her cousins called a cab so that she could go home. The three children went downstairs to wait and the cab came a few minutes later. The cab was tan with a black top, and was not a usual cab, rather appearing to be "an everyday car." Defendant was identified by the witness as the man driving the cab.

The minor entered the cab, sitting in the front passenger's seat, and her cousins gave the defendant her home address. The defendant then drove around the block and asked the witness to find out what cab company her cousins had called. She entered the house, returning with her cousins, who told defendant the name of the cab company and then again gave him the address of the minor's destination. Defendant then drove away, stopping once to buy cigarettes, and stopping again to get matches.

After driving for half an hour, defendant stopped the car in an area which had factories, houses, and a railroad, approximately three blocks from the minor's house. The witness stated that defendant then turned off the motor, reached over to the lock on the passenger's door, and pulled her by her legs until she was down on the seat. Her head was on the door and her feet and legs were up by the steering wheel. The minor was screaming and hollering during this time. Defendant pulled open her coat, causing buttons to pop off, and put his hand over her mouth and told her to shut up. He then pulled off her shoes and pulled one leg out of her pantyhose and panties. Defendant licked her vagina and put his tongue in her mouth.

The minor testified that after this defendant then told her, in cruder language, to insert his penis into her vagina. She obeyed, and defendant then got on top of her and proceeded to have sexual intercourse with her. Defendant declared that he was going to bust the witness' "cherry" and asked her, again in cruder terms, if she had ever had intercourse before.

She replied no and they argued over the truth of her response. He then got up and told the minor to get dressed. Defendant warned her not to tell the police or he would take her to his apartment and "screw" her.

After they both got dressed, defendant put his arm around the witness and told her he was sorry. He started crying and then told the witness "to give him [her] tongue and then he was biting it and everything and he was kissing [her]." The witness wiped away his tears and asked defendant if he had any family, to which he responded that nobody cared about him. Defendant asked her for some paper on which he wrote his name and phone number at work, which he gave to the witness. Defendant mentioned Valentine's Day to her and asked her to call him at work.

Defendant then proceeded to drive the minor home. Upon arrival the witness told defendant she would go get some money to pay him, and he told her she did not have to pay. She responded "Yes, they might suspect something," and ran into the house. Her brother, Kenny, 14 years old, was at the door and she told him to pay the driver. The witness then went to the back of the house to the bathroom, where her brother, Kevin, 17 years old, was taking a bath. On the way she removed her coat. The witness testified that about five minutes elapsed between her arrival home and her entry into the bathroom, but stated that she had gone directly to the bathroom. She told Kevin she had been raped.

The minor also testified that on the date of the occurrence she was five feet tall and weighed 90 pounds. She never opened the door to get out of the car, never mentioned she wanted to leave, and no one prevented her from exiting the car. The witness first stated that she had previously testified at an earlier hearing that an oral sex act had been committed and could not recall if she had told this to police on the date of the occurrence. The State later stipulated that she had not mentioned oral sex either to the police or at the preliminary hearing.

The witness identified panties and pantyhose as being the ones she wore on the night of the occurrence. It was stipulated later that she would have testified that the panties had no reddish-brown stain in the crotch area when she put them on, but that they did when she got home. There was an additional stipulation that a microanalyst, if called, would have testified that the vaginal smears showed human spermatozoa, and the stains on the panties were of human blood.

The minor victim's brother Kenneth next testified for the State that on February 9, 1975, at about 9 p.m., he was at home watching television when his sister arrived. She came in and told him to pay the cab driver. He said she made no complaints to him and that he did not observe anything unusual about her appearance. Kenny went out and paid the cab driver, whom he identified as being the defendant.

The victim's brother Kevin testified that at 9 p.m. on the night of the

occurrence he was home taking a bath. His sister entered the bathroom and told him she had been raped. Kevin put on a robe and went to the door, but Kenny told him that the cab driver had already left. Kevin testified that when his sister entered the bathroom "she was crying and shaking and her hair was all over her head and her clothes were * * * not neatly on her."

The minor victim was then recalled as a witness. She testified that, after they had arrived at her house, she told defendant she wanted him to be paid "[s]o he wouldn't hurt my brother, so he wouldn't be suspicious." Over defense counsel's objection she then testified that she wiped defendant's tears away that night "[s]o he wouldn't hurt me and I was playing along with him." Finally, she indicated over defense counsel's objection that another reason why she had wanted defendant to be paid was so her brother could see him. However, she admitted that she only told Kenny to pay the cab driver and not to be sure to look at him.

Officer James Griffin of the Chicago Police Department testified that on February 9, 1975, he and his partner, Officer James Sesso, received a call at about 10:30 p.m. to go to the emergency room at St. Anne's Hospital. Upon arrival he saw the minor victim in a green hospital gown, in an "emotional condition" with "tears coming from her eyes." He conversed briefly with her and received from her a piece of paper with some telephone numbers on it. Officer Griffin checked out the telephone numbers and then went to the 5000 block of West Van Buren where he spoke with Jerry Jenkins, who operated a cab service. Thereafter, accompanied by other police personnel, they proceeded to the 5200 block of West Van Buren. Officer Griffin observed a black-over-bronze Buick parked on the street which was stipulated to as being defendant's car. Jenkins led the police upstairs to defendant's apartment. Officer Griffin was admitted to the apartment by defendant's wife, and found the defendant in bed. Defendant dressed and accompanied the officers to the police station, where he was later picked out of a lineup by the minor victim and her brother Kenny.

Officer James Sesso testified that he spoke with defendant at the police station in the early morning hours of February 10, 1975. Defendant told him that he understood his rights and then related to Officer Sesso the events of the evening. He stated that he had picked up a fare the previous evening who appeared to be a girl of 17 or 18 years of age. She had put her arm around him during the trip and was kissing him, so he pulled over and they had intercourse. He then drove her home and told her not to pay him, but she insisted so that "it wouldn't look suspicious." The girl entered her home and a short time later a young male Negro came out and paid defendant $2. Officer Sesso also observed the minor victim when she arrived to view a lineup. He noticed the buttons on the lower portion of

her coat were missing. Officer Sesso had also examined defendant's car but found no buttons or blood therein.

Dr. R. Chandrasekhara testified that he was working in the hospital emergency room when the minor victim arrived. When he first saw her "[she] was already on the cart for examination, and she was emotionally disturbed and crying, [and] would not answer many questions." The doctor "had to get the story from the mother and police officer." He performed an external examination and noted abrasions and redness in the genital area. An internal examination was attempted but proved to be too painful for the patient. There was no bleeding, and the doctor did observe that "part of the hymen was intact." A smear test was made, which proved positive for spermatozoa.

Gloria Ann Golden was the first defense witness. She testified that she had known defendant for seven years. She was aware of his reputation in the community as a good and truthful person, and she would believe his testimony under oath.

The defendant testified in his own behalf that on February 9, 1975, he was working as a cab driver. He received a call to pick up a fare on South Western Avenue. He expected a male passenger, but when he arrived at the location a young woman entered the cab. He made sure she was the right passenger and started his trip, stopping twice on the way. The passenger was sitting in the front seat.

During the trip defendant began talking to the passenger. He "told her how good she looked, and [he] asked her [to] slide over." She did not answer verbally, but she did slide over closer to him. He estimated her height at 5 feet 6 inches and her weight at 145 to 160 pounds. He thought she was 18 years old.

Defendant continued to talk to his fare, telling her how nice she looked and what nice legs she had. She did not respond negatively but instead put her arm around defendant.

At the location which had been described by the minor as approximately three blocks from her house, defendant stopped the car and talked, discussing Valentine's Day. Defendant asked the girl if he could buy her something, and she said yes. He gave her his phone number at work and asked her to call him there the next day. She said she would. Defendant then asked the girl if he could make love to her and she said nothing. At this time she was already hugging and kissing defendant, so he slid her down on the seat and asked her to remove one leg from her pantyhose. She did, and then she complied with his request that she insert his penis into her vagina.

Defendant stated that all during this time he never threatened his passenger. Neither did the girl scream or cry out, but merely asked him to take it easy and not hurt her after penetration had occurred. At this point

defendant asked the girl her age and discovered she was only 12 years old. He immediately stopped the act of intercourse and withdrew without reaching orgasm. Defendant began to cry and told the girl he was sorry, and that if he had known her age he would not have had anything to do with her. She wiped his tears and said she was not mad at him. They both got dressed then and proceeded to the girl's house.

During the ride the girl asked what she could tell her mother and defendant said he did not know. He told her to tell her mother that he had to drop off some other passengers on the south side, and therefore she did not have to pay any cab fare. The girl insisted on paying because otherwise her mother would be suspicious. Defendant assented and asked for $2.

Defendant further testified that the girl had fully developed breasts. He denied french kissing her or engaging in cunnilingus. Penetration was not difficult and she was never in pain. He denied that he ever told the girl that he was "going to get her cherry." After penetration, he made no further movements because he discovered her age. To his knowledge the girl was not wearing a coat that evening. Defendant was 32 years old, 5 feet 4 inches tall, and weighed 170 pounds on the night of the occurrence.

Officer Griffin was recalled as a rebuttal witness. He testified that at the hospital he saw the girl lying on a table in a green hospital smock. "She showed no development of the chest. Later, when she came to the station with her mother for a line-up, she was standing with her sweater on; she showed no chest development."

On May 20, the court dismissed the aggravated kidnapping count. After closing argument, the court found the defendant guilty of rape. The court mentioned corroboration "including but not limited to" abrasions, congestion, running out of the car into the house, and prompt complaint. He also noted the relative age, size and maturity of the parties. In addition, the court found the defendant guilty of count 3, indecent liberties with a child (sexual intercourse), rejecting the defense that the defendant did not reasonably believe she was under 16, based on "all the evidence, which was corroborated and clear and convincing."

The counts dealing with deviate sexual conduct and unlawful restraint were dismissed solely because the court found that they arose from the same conduct charged in count 3.

The defendant was sentenced to four to six years on each count, to run concurrently.

## Opinion

■■■ Defendant initially contends that he was not proved guilty of rape beyond a reasonable doubt. In Illinois, in order to sustain a conviction of rape, the testimony of the complaining witness, or victim,

must be clear and convincing or corroborated by some other facts or evidence. (*People v. Mueller* (1954), 2 Ill. 2d 311, 118 N.E.2d 1; *People v. Collins* (1974), 21 Ill. App. 3d 800, 315 N.E.2d 916.) Defendant argues that the testimony of the minor in the instant case, that the act took place without her consent and against her will was neither clear and convincing nor corroborated. We must disagree.

In this case, the victim was a sexually inexperienced 12-year-old girl who was 5 feet tall and weighed 90 pounds at the time of the event in question. She testified that the defendant stopped his cab, reached over to the lock on her door, and pulled her down by her legs until she was flat on the seat. As she screamed and hollered he tore her coat open, put his hand over her mouth and told her to shut up. He undressed her and then ordered her to insert his penis and proceeded to have intercourse with her. Following the act he warned her not to tell the police.

We find that this testimony was in fact clear and convincing. The fact that the victim had a conversation with defendant and wiped his tears away does not alter this finding, as she testified that she was playing along with defendant and wanted to avoid his possibly injuring her. Neither does the fact that the victim first testified concerning the oral sex act at this trial militate against our finding. It is clear from the indictments that at *some* prior time she had told of defendant's performing cunnilingus. That she incorrectly stated that this was at the preliminary hearing and that she did not mention it to the police on February 10 does not act to make her testimony unbelievable. Clear and convincing evidence is not synonymous with uncontradicted or unimpeached testimony. Rather, minor variances in testimony may occur, and if so, such variances constitute mere discrepancies going only to credibility. (*People v. Wright* (1972), 3 Ill. App. 3d 829, 279 N.E.2d 398.) Where the victim's story is consistent and such discrepancies do not detract from its reasonableness, her testimony may be found clear and convincing. (*People v. Wright.*) This standard is applicable in the instant case.

Assuming *arguendo*, however, that the victim's testimony was not alone clear and convincing, we agree with the trial court that there was sufficient corroboration in this case so as to support defendant's conviction beyond a reasonable doubt. While the degree of corroboration necessary to conviction varies from case to case (*People v. Pointer* (1972), 6 Ill. App. 3d 113, 285 N.E.2d 171), the corroboration in the instant case is, in our view, quite substantial and more than adequate; there was prompt complaint to her brother Kevin upon arrival home, followed by prompt complaint to the police, medical evidence of abrasions and redness in the genital area, pain present upon attempted internal examination by the doctor, the victim's disheveled appearance to her brother Kevin, and her emotional instability and crying when talking with her brother, the police,

and the doctor. In light of such evidence we cannot agree with defendant's contention that because; (1) her brother Kenneth noticed nothing unusual about the victim, (2) her coat was not introduced into evidence, and (3) no other injury appeared on the victim indicating a struggle, her testimony must be considered uncorroborated.

■■ Defendant contends that the victim's own testimony shows that she willingly inserted his penis into her vagina with no struggle. However, the victim testified that she was yelling and screaming when she was pulled onto the seat and that defendant clapped his hand over her mouth and told her to shut up. Following this she obeyed his orders to submit to intercourse. We find such testimony sufficient to support the trial court's finding of force in this case.

The issue of force or consent is ultimately one of credibility. Such a determination is within the province of the trier of fact who heard the evidence and observed the demeanor of the witnesses. (*People v. Montgomery* (1974), 19 Ill. App. 3d 206, 311 N.E.2d 361.) A reviewing court will not disturb a trial court's judgment in this regard unless the evidence, on the whole, is so unsatisfactory or insufficient as to raise a reasonable doubt of defendant's guilt. (See *People v. Montgomery; People v. Pointer.*) As was noted by this court in *People v. Pointer*:

> "Those facts which will, or will not, establish these elements [of the offense charged] beyond a reasonable doubt will vary as might ages, or places or times. For example, the failure of an alleged rape victim to scream or cry out may be of pivotal importance in one case and quite insignificant in another. *So also might a fearful child offer less resistance to an attack than would an adult woman.* It is the totality of facts and circumstances which must be carefully examined in each case." (Emphasis added.) (6 Ill. App. 3d 113, 118, 285 N.E.2d 171, 175.)

In the instant case, considering all the testimony and the disparity in size and strength between the victim and defendant, we must conclude that the evidence was sufficient to support the trial court's finding of force.

Moreover, defendant's version of the incident is manifestly incredible. Even assuming that a 12-year-old virgin would respond to his flirtations so passionately, defendant's testimony in other regards was clearly contradicted. He testified that penetration was not difficult, despite her virginity; that he did not move while on top of her following the initial penetration; that the minor evidenced no pain upon penetration; that he did not reach orgasm; and that she had fully developed breasts. The evidence clearly contradicted defendant's testimony in each regard. The medical evidence showed abrasions and redness of the genital area; the doctor could not make an internal examination due to the pain the victim experienced; the vaginal smears showed the presence of human

spermatozoa; and the police officer stated that the minor evidenced no chest development. Defendant's testimony was properly disbelieved by the trial court. We find that he was convicted of rape beyond a reasonable doubt.

■■ Defendant contends secondly that the trial court erred in allowing the minor victim to be recalled as a witness. Permission to recall a witness is within the sound discretion of the trial court. (See *People v. Scott* (1973), 14 Ill. App. 3d 211, 302 N.E.2d 146, *aff'd in part* (1974), 57 Ill. 2d 353, 312 N.E.2d 596 (1974); *People v. Johnson* (1972), 8 Ill. App. 3d 457, 289 N.E.2d 722.) We find no error in the trial court's actions in this regard in the instant case.

The record reveals that the victim had testified that she had wiped defendant's tears away following intercourse, and that she had told him she wanted to pay him so that her family would not suspect anything. She was dismissed as a witness, and later that same day, following testimony from two other witnesses, the prosecutor indicated he wished to recall her, but that she had left. The trial court agreed to her recall and defense counsel indicated that he too would question her.

The next day the prosecutor indicated to the court that he wished to recall the victim because he had been remiss in not asking certain questions earlier. He indicated he had not spoken to the victim concerning her testimony following her dismissal as a witness the prior day. The prosecutor explained that he wished to ask the victim questions concerning her actions after the intercourse occurred in order to establish her mental state. Since the issue was one of force versus consent the trial court determined the evidence should be admitted as relevant, and allowed the recall. The court indicated that it would not be unduly influenced by the recall, but would weigh the victim's answers accordingly.

Contrary to defendant's contention on appeal the record reveals no "strenuous objection" on his part to this recall. Indeed, defense counsel initially indicated he too would like to question the victim again. Rather, defense counsel's only objection prior to the recall went to the fact that he did not know what questions were to be asked, and he objected to the fact that certain questions would be asked on recall which should have been asked during the State's direct examination of the witness. However, the court may allow the recall of a witness to prove matters inadvertently omitted previously or to adduce additional testimony. (See *People v. Blume* (1931), 345 Ill. 524, 178 N.E. 48; *People v. Scott; People v. Johnson.*) Having satisfied itself of the relevancy of the proposed inquiry, and having assured defense counsel it would weigh any adduced testimony accordingly, we find that the trial court properly allowed the State's motion for recall.

Defendant also argues that the testimony which was adduced upon recall was prejudicial and denied him a fair trial. It was only upon repeated questioning during the recall testimony that the victim stated (1) she was "playing along" with defendant when she wiped his tears, and (2) she insisted on paying defendant so her brother could get a look at him. Defendant argues he was prejudiced because the victim had 24 hours in which to concoct a story negating the defense of consent. We reject this contention.

■■ The heart of defendant's argument on this issue is essentially that during her initial testimony the victim adequately expressed her mental state when she stated that she told defendant she wished to pay him so her family would not suspect anything. He argues that this showed her intent to cooperate and cover up the sex acts. However, while this was in fact what she told defendant that night, the State could properly inquire as to what, if any, other reasons, underlay her actual words and actions. This the State did during the recall testimony.

The victim testified upon recall that the reason she wanted defendant paid was so her brother could see him. Contrary to defendant's contention there is no reason to believe the victim fabricated this story overnight. There was no evidence or indication of collusion by the prosecution. In addition, the victim did not even know she was to be recalled as a witness until the next day, just prior to the recall itself.

To the extent the victim's testimony seemed concocted to defense counsel, he certainly could argue this to the court. Defense counsel could, and in fact did, attack her statement upon re-cross-examination by eliciting testimony that she did not tell her brother to look at the cab driver, but only told him to pay him. Furthermore, since this recall of the victim occurred during the State's case, defendant was not prevented from preparing his case-in-chief to combat the additional testimony. Under these circumstances we find no prejudice to defendant and conclude that the trial court acted properly in allowing the recall of this witness.

■■ We next turn to defendant's contention that he may not properly be convicted of both rape and indecent liberties in this case since both convictions are based on the same act. The State concedes this point, and we agree, based on the Illinois Supreme Court's decision in *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1. Since both convictions in this case arose out of the same act of sexual intercourse the conviction for indecent liberties must be reversed and vacated. In view of our disposition of this issue we find it unnecessary to reach defendant's final contention that he was not found guilty of the offense of indecent liberties beyond a reasonable doubt.

For the foregoing reasons, the judgment of the circuit court of Cook

County is affirmed as to the conviction of rape, the judgment is reversed as to the offense of indecent liberties and the judgment and sentence entered thereon vacated.

Affirmed in part, and reversed and vacated in part.

SULLIVAN, P. J., and WILSON, J., concur.