THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICKY ROBINSON, Defendant-Appellant.

First District (5th Division)   Nos. 77-342, 77-1089 cons.

Opinion filed December 22, 1978.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Carol A. Kearney, and Thomas Bucaro, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

After a bench trial, defendant was found guilty of rape (Ill. Rev. Stat. 1973, ch. 38, par. 11—1) and sentenced to not less than four years and no more than four years and a day in the penitentiary. On appeal, the following issues are raised: (1) Whether defendant was proven guilty of rape beyond a reasonable doubt; (2) whether defendant's sixth amendment right to cross-examine witnesses was violated when the court refused to allow defendant to impeach the complaining witness with a transcript of her testimony at a preliminary hearing; (3) whether defendant was denied a fair trial where the record indicates that the trial judge was either unsure or could not remember important evidentiary facts; (4) whether defendant's fifth amendment right to remain silent was violated; (5) whether the cross-examination of defendant as to his opinion of the veracity of the State's witnesses constitutes prejudicial error; and (6) whether the assumption of unsupported facts by the prosecutor in his cross-examination of defendant constitutes prejudicial error. We affirm on all points.

Phyllis Ham, the complainant, testified that late in the evening on September 5, 1975, she and a group of her girl friends went to the Roadrunner Lounge at 75th and Phillips. While there, she danced once or twice with Michael Armour but she did not have anything to drink. At approximately 3 a.m., she began having chest pains. She asked one of her girl friends to drive her home, but the girl could not get her car started. After failing to find a cab, she asked another friend, Tiny, if he could drive her home. He said that he could not leave the lounge until it closed, but that he would find someone else to drive her home. Armour, who was a friend of Tony's, offered to drive her home. He said that he would take her home after he had first taken defendant home.

When they arrived at defendant's building, Armour got out of the car and told complainant that he was going upstairs to get something. She said that she would wait for him in the car. However, after he told her that he would only take a few minutes and that it would be unsafe for her to remain in the car, she decided to go upstairs too.

After they had entered defendant's apartment, defendant and Armour went into the bathroom. When they returned, they were smoking a reefer. After turning down Armour's requests that she join them, she asked him to take her home. He refused and she got ready to leave on her own. Armour then took her purse and refused to return it to her until he was ready to leave. Complainant then made an attempt to leave the apartment, but the door was locked. While she was trying to unlock the door, Armour grabbed her from behind and tried to make her sit down. She asked him to let her go, but he refused. He then called the defendant saying, "We got a wild one here * * * come on * * * and help me." Defendant came over and held her while Armour began taking off her clothes. She struggled to get free but Armour threatened to "rough her up" unless she cooperated. Armour and defendant then forced her onto a bed, where Armour began hitting her. He struck her five or six times on the face, arms, and legs. He managed to rip off the rest of her clothes and told defendant to leave. Armour then had intercourse with her.

After he was through, Armour called out to defendant telling him to come out of the bathroom because he needed to use it. Complainant then began picking up her clothes and tried to leave. However, she could not unlock the door. She said that there were at least two locks on the door. On cross-examination, she testified that she did not pay any attention to the number of the locks on the door, and that she guessed that the door locked from the inside with the same key used to open the door from the outside. While standing at the door, defendant came out of the bathroom naked and asked her where she thought she was going. When she said that she was leaving, he said that she was not going anywhere. They then

began to fight and defendant punched her in the nose, causing some bleeding. He then forced her to bed and forced his penis into her vagina. He told her that even though it was not his idea and he did not want to hurt her, he had to go along with Armour. She testified that she had not seen the actual penetration but that she knew that he could not have been using his finger because both of his hands were being used to hold down her arms.

A few minutes later, Armour returned and told defendant that he had to leave. Complainant began to dress and had gotten all her clothes on, except for one of her shoes, when she again tried to leave. Armour told her to stop and that he would take her home. She said that she did not want to go with him. He then asked her whether she thought they should kill her. She said that it did not matter because she wished she were dead. Armour then said that he was not going to let her leave because he wanted to teach her a lesson. Despite this warning, she tried to leave. When it looked like Armour and defendant were going to stop her, she threw some object at them. She believed that she hit defendant. On cross-examination, she testified that when she left the apartment defendant did not try to prevent her from leaving because he was in the bathroom.

While Armour was checking to see if defendant was injured, complainant managed to get out the door. She ran 40 feet to an elevator and closed the door just before Armour caught up with her. She took the elevator to the first floor and ran out the building. She said that she thought Armour was running behind her. She ran, with shoe in hand, across the street to her cousin's apartment, which was just four buildings down the block. She rang the doorbell and first her cousin's husband and then her cousin answered. They called the police. Later that evening, complainant went to a hospital.

Barbara Garland, the complainant's cousin, testified that at approximately 4 a.m. on September 6, 1975, she heard her doorbell ringing. She described the ringing as "a hysterical type of ringing of my bell three or four times in a row." She answered the door and found her cousin, the complainant, in a distraught condition. She was breathing very hard and her clothes were in disarray. She was also carrying one of her shoes in her hand. Complainant told Garland that she had just been raped by two men. When Garland noticed her continuously looking behind her, she asked her if she was being followed. Although she did not see anyone, Garland told her to come in out of the hallway and then called the police.

Leo Dorociak, a Chicago police officer, testified that he arrested defendant on September 7, 1975, in his apartment. During the arrest, defendant's wife was present. At that time, defendant denied the rape and said that he never had any woman in his apartment. Later, at the

police station, defendant gave a different statement to the police. He said that complainant was present in his apartment. He said that Armour told him that she was a freak and that she liked to be slapped around while she was having sexual intercourse. He said that he was in the bathroom while Armour was having intercourse with her, and that he only came out when Armour told him, "You can have her now." He then grabbed her and held her down while having intercourse with her. He stopped when he couldn't maintain an erection. He said that he couldn't maintain an erection because he knew that she was not willing and also he felt that he was doing something wrong.

On cross-examination, Dorociak was shown his police report from that day. The report failed to mention any statement by Armour that complainant was a freak. It did not state that defendant knew that she was not willing, although it did say that defendant "pulled" her down. Also, the statement indicated only that defendant "tried" to have intercourse but that he could not maintain an erection.

Defendant testified that he and Armour went to the Roadrunner Lounge at around midnight on September 5, 1975. He said that his wife was out of town on that night. While he was at the lounge, he spent his time dancing and having a couple of drinks. Armour spent most of the time dancing or talking with the complainant. When they left, the complainant came with them. Defendant testified that he had no conversation with Armour about taking her home.

When they arrived at defendant's building, he did not say anything to either Armour or complainant about coming up to his apartment. On cross-examination, he said that he was curious as to why they were coming with him, but he did not ask them. After they had arrived in the apartment, Armour and he smoked some marijuana. During this time, the complainant sat on the couch and said that she wanted to go home. He testified that there were two locks on the inside of the door to his apartment, but that neither of them was locked. He said that if somebody wanted to open the door, all they had to do was to turn the doorknob.

Five minutes after entering the apartment, defendant went into the bathroom to get ready for bed. Fifteen minutes later, Armour called him out of the bathroom. He told defendant that "he could have her." Defendant came out of the bathroom wearing his shorts and jeans. He took off his clothes and then got on top of the complainant. He said that he stuck his finger in her vagina because he could not get an erection. He testified that he could not get an erection because he did not think it was right to have intercourse with her. He was a newlywed and he did not think that it would be fair to his wife. Also, he said that he told her that an act of love should "be dealt with in a more private manner."

Defendant said he never saw Armour strike or grab complainant. He said that he never struck or forced himself on her. He denied ever seeing any bruises on her body. He also denied ever helping Armour carry her to the bed. When asked why he allowed Armour to take her to his bed, he said, "sometimes you have a friend that you let him bring a girl by your house, you know, when you are a bachelor."

After he had gotten off of her, the complainant put on her clothes. Armour then came out of the bathroom and asked her if she was ready to leave. Defendant did not hear what she said and he stated that he did not know if he was in the room at that time. Shortly thereafter, the complainant opened the door and walked out. Armour went to the door when she left, but by that time she had entered the elevator. Afterwards, Armour and defendant talked for 15 minutes and then he left. On cross-examination, defendant said that complainant had left behind some ripped panty hose, and that he had given them to Armour when he left.

Defendant testified that he had initially told the police that no woman was in his apartment because his wife was present and he did not want her to know anything about it. He denied ever telling the police that he did not believe the complainant wanted to have intercourse with him. He said that she never resisted either Armour or him. Also, he denied telling the police that he thought she wanted to be slapped around. He said that he told them that what he meant by "freak" was a woman who liked to perform sex with two or more people.

OPINION

The first issue on appeal is whether defendant was proven guilty of rape beyond a reasonable doubt. To sustain a conviction of rape, the testimony of the complainant must be clear and convincing or corroborated by other evidence. (*People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285; *People v. Thompson* (1978), 57 Ill. App. 3d 134, 372 N.E.2d 1052.) Defendant contends that complainant's testimony was neither clear and convincing nor corroborated by other evidence. We disagree since we find her testimony to be both clear and convincing and sufficiently corroborated by other evidence.

Complainant testified that she accepted a ride from Armour because she had experienced chest pains while at the lounge and she felt that she should go home. She went up into defendant's apartment only because Armour had told her that he would stay there for only a few minutes and that it would be unsafe for her to wait in the car. When it appeared that Armour was going to stay in the apartment longer than he had said, she asked several times if they could leave. When she attempted to leave, she was stopped by Armour. They struggled and then defendant came over

to hold complainant while Armour began ripping off her clothes. After she had been placed on a bed, Armour told defendant to leave and, after this, he had intercourse with her. Shortly thereafter, Armour called defendant who came out of the bathroom naked. She attempted to leave but defendant refused to let her leave and he began fighting with her. He punched her in the nose, thus drawing blood, and then forced her onto the bed and forced his penis into her vagina. She said that even though she did not see the actual penetration she knew that he could not have been using his finger because both of his hands were being used to hold down her arms. A short while later, after defendant had finished and she had redressed, she escaped from the apartment. She ran from the building across the street to her cousin's home, and told her cousin that she had been raped by two men. They then called the police.

Defendant contends that complainant's testimony is less than clear and convincing. He states that there were several clear contradictions in her testimony and that some portions of her testimony were confused or "highly improbable."

■■ The requirement that a complainant's testimony be clear and convincing does not mean that it must be uncontradicted or unimpeached. (*People v. Wright* (1972), 3 Ill. App. 3d 829, 279 N.E.2d 398.) Minor variances in testimony may amount to no more than discrepancies going to credibility. (*People v. Thompson* (1978), 57 Ill. App. 3d 134, 372 N.E.2d 1052.) If these discrepancies do not detract from the reasonableness of complainant's story, the testimony may still be found to be clear and convincing. (*People v. Brown* (1975), 32 Ill. App. 3d 182, 336 N.E.2d 523.) In the present case, we have carefully considered the contradictions in complainant's testimony. We also have carefully considered the portions of complainant's testimony which defendant characterizes as "highly improbable." We find that neither detracts from the reasonableness of complainant's testimony, but merely goes to the question of credibility. Therefore, we find that complainant's testimony is clear and convincing on the question of rape.

■■■ Furthermore, we find that there is sufficient evidence of record to corroborate complainant's story. After the rape, complainant made an immediate outcry. She ran to her cousin's home and told her cousin that she had just been raped by two men. The cousin described complainant as being distraught and disheveled. After the cousin was told about the rape, the police were called. Additionally, defendant's testimony corroborates parts of complainant's testimony. He testified that he had climbed on top of complainant. He also testified that he had given some torn panty hose to Armour after complainant had left the apartment. In light of the clear and convincing nature of complainant's testimony and

this corroborative evidence, we find that defendant's guilt was proven beyond a reasonable doubt.

The second issue which we consider is whether defendant's sixth amendment right to cross-examine witnesses was violated when the court refused to allow defendant to impeach the complaining witness with a transcript of her testimony at a preliminary hearing. At trial, complainant testified that when she was struggling with Armour and defendant in the apartment, Armour began trying to take off her clothes. She said that when she was forced to the bed, her pants were "half way on and half way off." When she was on the bed, Armour removed her shoes, pants, panty hose, and panties. On cross-examination, defendant sought to impeach complainant's testimony with a transcript of her preliminary hearing testimony. At the preliminary hearing, complainant had testified that Armour had removed some of her clothes during the struggle. When she was thrown on the bed, she did not indicate that Armour removed any more of her clothing, but rather she indicated that he had intercourse with her. Defendant argues that this testimony impeaches complainant's testimony at trial that Armour removed her clothing while she was on the bed.

The trial court has discretion in determining the extent to which cross-examination is to be allowed. A reviewing court will not find reversible error where cross-examination might have been unduly restricted "unless there was a clear abuse of this discretion, resulting in manifest prejudice." (*People v. Hubbard* (1973), 55 Ill. 2d 142, 151, 302 N.E.2d 609, 613.) In this instance we do not find any clear abuse of discretion, resulting in manifest prejudice to defendant. If the court had permitted this means of cross-examination, it is unclear where complainant would have been impeached. Complainant's preliminary hearing testimony indicates that some of her clothing was removed before she was thrown to the bed. Her trial testimony indicates that her pants were "half on and half off" when she was thrown to the bed. We do not believe that the latter testimony is necessarily inconsistent with the former. Furthermore, even if complainant's preliminary hearing testimony impeaches her trial testimony we cannot see how defendant would be manifestly prejudiced by the court's failure to permit such impeachment. The impeachment is, at best, only remotely connected to the charge of rape against defendant.

We next consider whether defendant was denied a fair trial where the record indicates that the judge was either unsure or could not remember important evidentiary facts. Defendant points to two instances in the record where it appears that the trial judge might have been confused over evidentiary facts. First, during cross-examination of defendant, this exchange took place:

"Q: So that when the police officer took the witness stand and testified today that you told him at the police station that you had no woman in your apartment he was lying or mistaken?

A: I didn't hear the police officer say that.

Q: You didn't hear it?

Mr. Weiss [Defense Counsel]: No, I think the police officer stated that at the apartment the defendant told him this, I think that is the—

The Court: Well, I don't exactly recall where it was. I do recall he said something.

Mr. Weiss: It was in the apartment, in the presence of his wife when he first—"

The police officer's testimony was that defendant had told him at his apartment that he had no woman in his apartment, but that he had told him at the police station that he had a woman in his apartment. Second, during the trial judge's review of the evidence in the case, he commented that:

"* * * the prosecuting witness tells us that * * * Mr. Armour said they had to stop by this defendant's house and she was prepared to wait in the car, but that *they* suggested that would not be safe *or one of them* said it would not be safe for her to stay there, and that she would be safer in the house, and that was the reason that she came to the apartment." (Emphasis added.)

The testimony at trial was that only Armour had suggested that complainant accompany them to the apartment.

Regarding the first instance of confusion, we find that events subsequent to the judge's statement indicate that he was aware of what the police officer had stated in his testimony. Immediately after the trial judge's statement, he was made aware of the correct testimony by defendant's counsel. Also, during his review of the evidence, the trial judge stated that the defendant's story was that complainant was in his apartment. No mention was made of any confusion concerning the police officer's testimony and we believe that the trial judge's statement indicates that there was no longer any confusion.

■■ Although it appears that the trial judge was confused as to who asked complainant to come up to defendant's apartment, we do not think that this confusion merits reversal in this case. Looking at the totality of the trial judge's comments in his review of the evidence, we think that the matter of who asked complainant up to the apartment played a very insignificant role in defendant's conviction. This was not a case where the court forgot testimony which went to the crux of the defense. (*People v. Bowie* (1976) , 36 Ill. App. 3d 177, 343 N.E.2d 713), nor was it a case where the trial judge had forgotten that defendant had called any witness

at all. (*People v. Morgan* (1976), 44 Ill. App. 3d 730, 358 N.E.2d 909.) The evidence that defendant had raped complainant was clear and convincing. Therefore, we find that defendant was not denied a fair trial on this issue.

The fourth issue we consider is whether defendant's fifth amendment right to remain silent was violated as a result of the following lengthy exchange:

"By Mr. Robbins (Assistant State's Attorney):

Q: Your wife didn't accompany you to the police station, did she?

A: No.

Q: You rode in a squad car with one or two policemen and yourself and no one else?

A: Yes.

Q: You didn't take that opportunity to correct the lie that you told him at your apartment, did you?

Mr. Weiss (Defense Counsel): Objection, Your Honor, he was questioned at the police station.

The Court: The objection is overruled, he may answer yes or no.

The Witness: Repeat the question.

By Mr. Robbins:

Q: You were out of the presence of your wife as soon as you left the apartment, were you not?

A: Yes.

Q: And you told them a lie at the apartment, had you not?

A: Yes.

Q: You told them there was no woman in your apartment and that wasn't true, was it?

A: No.

Q: And the reason you told them that was because your wife was present, is that correct?

A: Yes.

Q: But as soon as you left the apartment you were out of the presence of your wife, were you not?

A: Yes.

Q: In fact, you left the apartment, you went down, you got into a squad car, is that correct?

A: Yes.

Q: And all that time during the squad car ride to the police station you were out of the presence of your wife, is that correct?

A: Right.

Q: Did you take that opportunity, Mr. Robinson, to correct the lie you told to the police?

Mr. Weiss: Objection, he wasn't being questioned there.

The Court: Objection sustained."

Defendant contends this exchange indicates that "the trial judge was equivocal about whether Robinson's silence could be considered as impeachment." We disagree.

■■ We read the record as indicating that the Assistant State's Attorney was not permitted to elicit from defendant whether he remained silent in the squad car. Defense counsel objected to the question which would have brought forth that response and the trial court sustained the objection. Furthermore, since this was a bench trial, we think that it would be proper in this instance to presume that the court disregarded any inferences which might have arisen from the Assistant State's Attorney's questions. (*People v. Kneller* (1975), 25 Ill. App. 3d 935, 323 N.E.2d 469.) Therefore, we hold that defendant's fifth amendment right to remain silent was not violated.

Next, we consider defendant's claim that the cross-examination of him as to his opinion of the veracity of the State's witnesses constitutes prejudicial error. Defendant points to the following three instances in which he was asked to comment on the veracity of Investigator Dorociak:

"Q: So that when the police officer took the witness stand and testified today that you told him at the police station that you had no woman in your apartment he was lying or mistaken?

A: I didn't hear the police officer say that.

Q: You didn't hear it?

* * *

Q: * * * When the investigator testified yesterday that he told him that by being a freak you meant that she liked to be slapped around during intercourse he was lying or mistaken, is that correct?

A: He was mistaken.

* * *

Q: In fact, you told the police that you believed Ms. Ham did not want to have intercourse with you, didn't you?

A: No.

Q: So that when the police officer testified to that yesterday he was lying or mistaken about that?

Mr. Weiss: I don't believe a police officer testified to that.

Mr. Robbins: He most certainly did.

The Court: Objection overruled.

The Witness: Ask the question again, please.

Q: So when the police officer testified yesterday that you told him that you did not believe Miss Ham wanted to have intercourse with you he was lying or mistaken?

A: I would have to say yes.

Q: Which is it, lying or mistaken?

A: He was either lying or mistaken because I didn't say anything like that and I didn't hear anything like that yesterday.

Q: Do you remember telling us that you were under the impression that the woman wanted to be slapped around?

A: No, I didn't.

Q: So he was mistaken about that as well."

Defendant contends that since his testimony was credible, a plausible explanation for the trial court's disbelief of his testimony was that the court was influenced by the above misconduct.

■■ The State's questioning of defendant was clearly improper. However, we find that this questioning neither constituted a material factor in the court's decision nor resulted in any prejudice to the defendant. (*People v. Addison* (1977), 56 Ill. App. 3d 92, 371 N.E.2d 1025.) In its review of the evidence, the court did not consider the testimony of Dorociak in rendering its decision. The court relied on the clear and convincing testimony of complainant and the corroborative testimony of complainant's cousin and, in certain respects, the testimony of defendant. On the strength of this evidence, we do not believe that the trial court, absent the improper questioning of defendant, would have rendered a different decision. Furthermore, this was a bench trial and "it is presumed that the trial court makes its findings only upon competent evidence." (*People v. Walker* (1978), 58 Ill. App. 3d 535, 539, 374 N.E.2d 880, 883.) Therefore, we find no prejudicial error in this instance.

Finally, we are asked to consider whether the assumption of unsupported facts by the State in its cross-examination of defendant constitutes prejudicial error. The facts assumed by the State were: (1) that defendant was so sure that what he was doing to complainant was wrong that he was expecting the police to come; (2) that he told the police at the police station that there was no woman in his apartment; and (3) that he had previously testified that he was under the impression that complainant wanted to be slapped around. Defendant contends that the court could have believed that these assumed facts seriously impeached his credibility and thus caused the court to disregard defendant's plea of innocence.

■■ The State's assumption of facts unsupported by evidence was clearly improper. However, we do not believe that the State's impropriety merits reversal in this instance. Initially, we note that the assumption of facts in this case was not substantial, repeated, or definitely prejudicial. (*People v. Hawkins* (1975), 61 Ill. 2d 23, 329 N.E.2d 221; *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353.) Next, we note that in its review of the evidence the court did not consider any of the assumed facts before rendering its decision. Lastly, in this instance, we see no need to reject the

presumption that in a bench trial, the trial court makes its findings based only on competent and relevant evidence. Therefore, we find no prejudicial error in this instance.

For the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.