THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD W. BARR, Defendant-Appellant.

First District (4th Division)    No. 79-1189

Opinion filed June 19, 1980.

Douglas P. Trent, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Edward Bishop, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County the defendant, Ronald Barr, was found guilty of the offense of rape and sentenced to a term of six to eight years in the Department of Corrections. On appeal, he argues the trial court erred in refusing to suppress and admitting into evidence a statement made by him where it was not shown that he knowingly and intelligently waived his privilege against self-incrimination and right to counsel, and (2) that he was not proved guilty beyond a reasonable doubt where the testimony of the complainant is not clear and convincing and is not corroborated by other facts and circumstances, and where the facts do not show that the act of sexual intercourse was forceful and against the will of the complainant.

At trial, the complainant testified that on June 5, 1975, at approximately 1:20 a.m., she left her boyfriend's home in Woodridge, Illinois, and began to drive to her parent's home in Western Springs, Illinois. While driving east on 75th Street she noticed a car following her so closely that she could not see its headlights. She made several turns and ran a stop sign in an attempt to lose the car behind her. The complainant said she did not attempt to pull into a service station or to stop any vehicle for assistance although she had the opportunity to do so. The other car followed her for about eight miles until she reached the intersection of Woodland and Crestview. The other car passed her at this point. She was afraid that the other car would hit her and so she turned the wheel of her car to the right and stopped it with the front wheels resting about three feet onto a grassy area. It was then approximately 2 a.m. The other car pulled in front of hers and also stopped. She said she could have backed

up her car and driven away but "the car went around in front of me and I couldn't get around his car at that time so I just stopped, there wasn't anything else I could do."

The complainant testified that the driver of the other car walked over to her car. She had never seen the man before so she rolled up her window and locked the door. The complainant identified the man in court as the defendant. The defendant twice told her to get out of her car. She refused to do so. The defendant then said "if you don't get out of the car I'm going to kill you, I have a gun." Although he did not have anything in his hands, the complainant testified that she thought he might have a gun in his pocket. She thought she would be killed if she refused to do as she was told so she unlocked the door and got out of her car.

The defendant grabbed her left arm and her neck and started to strangle her. She screamed loudly and began to struggle with the defendant. She kicked and hit him and pulled his hair but he continued to strangle her. She started to see double as if she were about to black out. The complainant said that at the time of the rape she was five feet three inches tall and weighed 95 pounds.

The defendant began to drag her toward the front of his automobile. She was still kicking, struggling, and trying to get away from him. When they reached the front of his car he pushed her down onto the street. As she lay on the ground she screamed again. The defendant, who was still strangling her, told her twice that if she did not stop screaming he would kill her "right now."

The defendant then picked her up from the ground and threw her onto the hood of his car. She continued to struggle with him. He shoved her into the car, through the open driver's side door. She continued to try to get away but he was holding her by the throat while he pushed her into the car.

The defendant entered the car after pushing her in and he turned off the lights and motor. He then left the car, leaving the keys in the ignition, went to the complainant's car and turned off that car's lights. While he was gone she did not attempt to start the car or lock the door because she was mainly concerned with getting out of the car and escaping. By the time she started to get out of the car the defendant had returned. She did not scream "because I was afraid that he was going to kill me, he kept telling me that over and over."

When the defendant was back in the car he told the complainant to take off her clothes. When she refused to do so he said he would do it for her if she did not. He also said he would kill her if she did not take off her clothes. The complainant said she was crying, shaking, and was extremely upset and afraid that she was going to be killed. She let the defendant remove her clothing while she pleaded with him not to do so. The

defendant removed her clothing, leaving her slacks and panties on her left leg and her left shoe on her foot. She did not attempt to prevent him from removing her clothes. While she was in the car with him she did not hit or strike him. The defendant then took off all of his own clothing.

The defendant lay down on the seat of the car and told her to lie on top of him. She refused and so he pulled her on top of his body and began to move against her. He then put his penis into her vagina. The defendant got on top of her and again inserted his penis in her vagina. She spread her legs so he could enter her because he told her to do so. The complainant said "he kept repeating that if I didn't do these things he was going to kill me and I was scared, scared to death." During the preliminary hearing she said the defendant lay on top of her during the first act of intercourse and that she lay on top of him during the second act.

The complainant also testified that after the second act of intercourse she told the defendant that she had to get up early and go to work and that she really had to leave. As she began putting on her clothing he asked for her phone number. She told him to look for some paper while she was dressing. She pulled up her blue jeans, leaving her panties around her ankle and put on her top. She did not put on her sweater or her right shoe. The defendant found some paper but told the complainant he did not want her phone number because he did not think she would give him the right one. He asked her if she was going to turn him in and she replied she would not. She testified she was not being truthful when she said this. The defendant then told her he thought he should tell her his name because he was a sick person and needed help; he then told her his name was Ron Barr.

The complainant then got out of the defendant's car, carrying her sweater and shoe, entered her own car and drove home. She arrived home about two minutes later, entered the house and began yelling for her father. She ran toward her parents' bedroom screaming she had been raped.

The complainant went to the police station with her father and there she discovered that one of her earrings was missing. It was found later that day at the scene of the occurrence by a police officer. After leaving the police station her father took her to the hospital where she received an internal examination. She said she had abrasions and scrapes on her knees and bruises on her neck as a result of the incident with the defendant. The bruises on her neck were not visible until the day after the rape.

Adrian Glennon testified that she lives four or five houses from the intersection of Woodland and Crestview in Western Springs. On the date in question, at approximately 2 a.m., she was awakened by a scream. It was loud and piercing and sounded like a girl. She looked out her bedroom window but did not see anyone. She heard only the one scream

that evening. Using a photograph depicting the location of the occurrence, the witness testified that she could not see that area from her bedroom window.

Kathleen Bowler, Glennon's sister, said she was driving past the intersection of Woodland and Crestview about 2 a.m., on the evening in question. She saw two automobiles on the side of the road. One was parked in front of the other. A man was pushing or shoving a woman into the driver's side of the car which was in front of the other one. When she first saw the woman she was half in and half out of the car, being pushed into it, and the man was completely outside of the car. She could not describe the two people other than to say that both were white. She did not see the man holding the woman around the neck and she did not see any type of weapon in his possession. She did not notice any physical resistance on the part of the woman being pushed into the car. She did not think the woman needed help and she did not call the police.

The complainant's father testified that on the date in question, at approximately 2 a.m., he heard his daughter in the hallway of the family home screaming. He said she was hysterical. She came into his bedroom crying. She was very upset and kept saying "he would kill me and that he raped me." He described his daughter's clothes as looking like she had been sleeping in them and said her hair was "mussed up." She was wearing only one shoe. He called the police, took his daughter to the police station, and later took her to the hospital. He observed scrapes on her left knee that night and saw bruises on her neck the next day.

Dr. Jack Sampson testified that he examined the complainant at approximately 4:30 a.m., on June 5, 1975. He observed some scrapes on both her knees and on the upper part of her right foot and a circular reddening around her throat. The marks on her throat were caused by the application of external force, in his opinion, and could have been caused by strangulation.

The statement which the defendant made at the time of his arrest was admitted into evidence. The sequence of events related in that statement was an abbreviated version of the defendant's testimony at trial.

The defendant testified in his own behalf. He said he saw the complainant as she was driving past 75th and Main Streets in Downers Grove at approximately 12:30 a.m., on the night in question. He had never seen her before. He followed her because he was lonely and wanted someone to talk to and because he was "horny." He followed her for seven or eight miles and then passed her car near 55th and Woodland Streets. The defendant said he stopped his car in front of that of the complainant. She got out of her car and walked over to his. She spoke to him, saying something about how she was sorry about hitting a rabbit.

The defendant said he got out of his car and took hold of the complainant's arm. She screamed and he reached for her mouth but his hand ended up on her throat. They both fell to the ground. The defendant helped her up from the ground and asked her if she would like to get into his car to talk. The defendant testified that the complainant no longer tried to get away from him after she fell.

The complainant got into the defendant's car voluntarily. He helped her get in the car "[l]ike a gentlemen [*sic*] helps a lady into a car." During the subsequent conversation, the defendant asked the complainant "if she wanted to go all the way." She said no, but offered to give him a "hand job." After doing so for 10 or 15 minutes the complainant suggested that they go all the way. They both disrobed and the complainant got on top of the defendant. The defendant said his penis would not go into her vagina so they changed positions and he got on top of the complainant. He said his penis again would not go into her vagina so he asked her to finish giving him a "hand job." She played with his penis for about 10 minutes and then he told her to forget it. On cross-examination, the defendant admitted slight penetration.

The defendant said he and the complainant then put their clothes back on and had a conversation about their jobs and the concert she had been to with her boyfriend. She left his car and then the defendant drove home.

Following closing arguments the trial judge found the defendant guilty of rape.

Prior to trial there was a hearing on the defendant's motion to suppress the statement he made to the police. At that hearing Western Springs Police Officer Dwayne Dehnicke testified that on the date of the occurrence he and three other officers went to 109 East 60th Street in Downers Grove. The defendant's father, Lloyd Barr, allowed them to enter the house.

The defendant was awakened and Dehnicke informed him of his *Miranda* rights. The defendant acknowledged that he understood the rights but he remained silent when asked if he wished to talk to the policemen at that time.

The defendant was taken to the Western Springs police station. In an interrogation room, Dehnicke again read the defendant his rights. The defendant's father was also present. Again, the defendant said he understood the rights but remained silent when asked if he wished to talk.

Dehnicke then had a conversation with Lloyd Barr, in the defendant's presence. In response to a question from Lloyd Barr, Dehnicke said, "If I feel there is any doubt or if there is a vast discrepancy to indicate that Ron [the defendant] is not involved in this thing, then I can release him,

because then I feel in my own mind he wouldn't be the right person." Dehnicke also said, "If I find Ron is not the person I'm after, or if the offense did not take place, then I don't want to go to Court, if I don't have to. If it's unnecessary, then I want to try to determine it's unnecessary." At the conclusion of Dehnicke's conversation with Lloyd Barr, the latter said to his son, "Well, go ahead and then answer."

Lloyd Barr testified that he advised his son to give a statement because "if you are telling the truth you have nothing to hide and nothing to lose." The defendant said when he made the statement to Dehnicke he believed he would not be charged because of Dehnicke's representation that if there were a vast discrepancy between the two stories he would be released.

The court denied the motion to suppress and the statement was introduced into evidence.

The first issue on appeal is whether the State met its burden of proving that the defendant's statement at the police station was made voluntarily. The defendant makes two separate arguments in this regard: first, that the police conducting the interrogation coerced him into giving a statement by implying to him that he could possibly be released immediately after he made a statement; and, second, that the statement was involuntary because the police used his father as a "tool of coercion" while the defendant was being interrogated.

■■ We need not reach the issue of whether the statement was made voluntarily. In *People v. Auilar* (1974), 59 Ill. 2d 95, 319 N.E.2d 514, the supreme court noted that "it generally has been held that if a defendant takes the witness stand and admits in substance matters contained in a confession or statement he has given the police, this testimony will be considered to have waived or made harmless any error that may have occurred in the admission of the confession or statement." (59 Ill. 2d 95, 100, 319 N.E.2d 514, 516-17.) Here, the defendant's testimony was substantially the same as his statement to the police. On both occasions he admitted having sexual intercourse with the complainant. According to the defendant, both in his statement and at trial, it was a consensual act. Therefore, even if there was error in denying the defendant's motion to suppress, the defendant's testimony at trial constituted a waiver of his right to make this argument or made harmless any error that might have occurred.

The defendant also argues he was not proved guilty beyond a reasonable doubt because the testimony of the complainant was not clear and convincing and was not corroborated by other facts and circumstances and because the facts do not show that the act of intercourse was forceful and against the will of the complainant.

In *People v. Rodriquez* (1978), 58 Ill. App. 3d 775, 374 N.E.2d 1062, this court wrote:

"The Illinois Supreme Court has, in numerous cases, held where a conviction of a sex crime depends on the testimony of the prosecuting witness and the defendant denies the charge, the testimony of the prosecutrix, unless it is clear and convincing on its own, must be corroborated. [Citations.] Since a sex charge is easy to make and most difficult to defend, proof of corroboration is necessary for a proper prosecution whenever the testimony of the prosecutrix is anything less than clear and convincing." (58 Ill. App. 3d 775, 778, 374 N.E.2d 1062, 1065.)

This court has also noted that clear and convincing evidence does not mean the testimony must be uncontradicted or unimpeached. Minor variances in the testimony may occur, and such variances are mere discrepancies which go only to the issue of credibility. *People v. Thompson* (1978), 57 Ill. App. 3d 134, 372 N.E.2d 1052.

In making this reasonable doubt argument, the defendant relies on the following portions of the testimony below: the complainant testified that while she was being followed she did not attempt to pull into any service station or stop another vehicle for assistance although she had an opportunity to do so; she did not observe a gun, knife, club or other weapon in the defendant's possession while she was with him; she testified that she could have backed up her car when the defendant first stopped his own car; she said there were no marks on her neck the evening of the alleged rape even though she testified that the defendant squeezed her neck very hard; she said the defendant left her alone in his car and during this time she did not blow the horn, leave the car or try to start the car; she did not attempt to prevent the defendant from removing her clothing; she did not hit or strike the defendant while in his car with him; she did not put her legs together to prevent the defendant from entering her; and the physician who examined the complainant said he saw no evidence of vaginal trauma.

■■ We believe the complainant's testimony was not only clear and convincing but that it was sufficiently corroborated so as to establish the defendant's guilt beyond a reasonable doubt. The defendant has been able to point to only a few minor inconsistencies in the complainant's testimony. As noted in *Thompson*, such discrepancies go only to credibility which is a question for the trier of fact and is not an issue for the reviewing court. The complainant's version of events was corroborated in a number of respects. Adrian Glennon, who lived in a home close to the scene of the crime, testified that she heard a loud scream at the critical time. Kathleen Bowler drove past the scene of the

crime, saw two automobiles parked on the side of the road and saw a man pushing or shoving a woman into the front automobile. The complainant immediately reported the rape to her parents and the police were promptly called by the complainant's father. The complainant's father described his daughter as crying and very upset and said she looked as though she had been sleeping in her clothes when she arrived home. He also testified to seeing scrapes on his daughter's knee and bruises on her neck the next day. The examining physician also saw scrapes on the complainant's knees and red marks on her throat. This evidence would constitute sufficient corroboration even if the complainant's testimony had not been clear and convincing.

We similarly reject the defendant's argument that the evidence does not show that the act of intercourse was forceful and against the will of the complainant. According to the complainant's testimony, the defendant repeatedly threatened to kill her and he choked her until she saw double. He also threw her on the ground and onto the hood of his car and then forced her into the car. The complainant also testified that she struggled with the defendant, and that she kicked and hit him and pulled his hair. When the defendant dragged her towards the front of his automobile, she continued kicking, struggling and trying to get away from him. He pushed her down onto the street at the front of his car and said he would kill her if she did not stop screaming. She continued to try to get away as the defendant held her by the neck and shoved her into the car. The complainant also testified that she initially refused to take off her clothes and that she let him remove her clothing only after he said he would kill her if she did not remove it by herself. She also said she was crying, shaking, upset and afraid that she was going to be killed. The trial judge, as trier of fact, was entitled to believe this testimony. We believe it establishes that the acts of sexual intercourse were forceful and against the will of the complainant. We thus reject the defendant's arguments that he was not proved guilty beyond a reasonable doubt.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN, P. J., and JOHNSON, J., concur.