THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HENRY POINTER, Defendant-Appellant.

(No. 55572;

First District—May 30, 1972.

Gerald W. Getty, Public Defender, of Chicago, (Ronald P. Katz and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Edward B. Mueller, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE LYONS delivered the opinion of the court:

The defendant, Henry Pointer, was charged with rape, indecent liberties with a child and contributing to the sexual delinquency of a child in violation of Ill. Rev. Stat. 1969, ch. 38, pars. 11—1(a), 11—4 and 11—5. Following a bench trial, defendant was found guilty of rape and contributing to the sexual delinquency of a child. He received concurrent sentences of not less than four years nor more than four years and a day in the Illinois State Penitentiary on the rape conviction and one year in the County Jail on the conviction for contributing to the sexual delinquency of a child.

On appeal, defendant contends that he was not proven guilty beyond a reasonable doubt and that the trial court erred in finding him guilty of both rape and contributing to the sexual delinquency of a child because both offenses arose from a single alleged act.

At trial, Brenda Clark, the complaining witness, testified that she went to her aunt's apartment about 7:00 P.M. on March 24, 1970. She was met at the door by the defendant, her aunt's boyfriend whom she had known for about six years. The defendant informed Miss Clark that her aunt had gone on a short errand and invited her to wait in the living room. She sat on the sofa and watched the defendant proceed to turn out the living room, kitchen and bedroom lights. The defendant "turned up the T.V." and walked toward her. Then, according to Miss Clark:

"[He] bent over me * * * and I hit him and managed to knock him out of the way * * * [I] ran in the kitchen * * * and got some * * * silverware and told him if he came at me I was going to stick him * * *. He knocked it out of my hand and caught my arm and twisted it. I don't know which arm it was. It was dark and he just took it and twisted it and told me if I hollered he was going to break my arm and choke me * * *. Then he got me up in a hoop and * * * took me on to the bedroom * * *. He laid me on the bed and still had my arm twisted. He told me to take off my panty hose * * *. Then he got on top of me and put his penuckle in me and I was struggling with him * * *. So then he start talking all out of his head. He told me you know you like this. You got other men doing it. Don't you want a baby. I told him no, that I told my

mother I was going to finish school and everything. Then he told me all right, I will get a rubber then  *  *  *. So he kept telling me wait. It was only going to take a second. So when he did get up he went in the bathroom. He was washing his face and I came on in. I sit down on the toilet stool and was fixing my clothes back up on me. He gave me my aunt's yellow douche bag  *  *  *. He told me to rinse myself out good  *  *  *. So then he offered me fifty cents and I told him I didn't want his money. He left on out and went in the front room and I came on out  *  *  *. He told me don't tell it, Brenda and I told him I wasn't going to tell it  *  *  *. As I was going downstairs and got in running distance, I told him my uncle was going to get him  *  *  *."

Miss Clark further stated that she ran over to the home of her sister's girl friend. She later saw her sister, Helen, and told what had happened. Her sister phoned the police and sometime that evening she went to the hospital and was examined by a doctor.

During cross-examination, Miss Clark testified that she ran home after leaving her sister's girl friend's house. She met her cousin there and, in her words, "He asked me what was wrong and I told him about my aunt's boyfriend had raped me  *  *  *. Some of his friends called him and told him to come on they was fixing to go to the skating rink, told me he would see me." She also indicated that she struggled with the defendant throughout the entire incident but did not scream or otherwise cry out. She was unable to fix the times at which the various events of the evening in question took place, but did return that night to her aunt's apartment and relate the incident to her "aunts and uncles."

On redirect examination, Miss Clark stated that she had kept her coat on during the intercourse and noticed, later that evening, that the coat was spotted with blood. She was unable to state whether anyone other than she and the defendant was present in the apartment at the time of the incident. She denied having given the defendant permission to have intercourse with her. Miss Clark was fifteen years of age at the time.

Officer William Phillip of the Chicago Heights Police Department testified that he was assigned to investigate a possible rape on March 24, 1970, about 8:00 P.M. He conversed with Brenda Clark at her home in the presence of her sister and her sister-in-law. He drove Miss Clark to St. James Hospital where she was examined by Dr. DelGado. Later that evening Officer Phillip arrested the defendant.

Helen Clark, Brenda's sister, testified that she saw Brenda about 8:00 P.M. and Brenda was crying and screaming. Brenda's clothes "were all jumbled up" and her coat "had a spot of blood on it." She further stated that Brenda said she had been raped by the defendant.

By stipulation, the following evidence concerning Dr. DelGado's examination of Miss Clark was introduced:

"* * * that about eight-thirty p.m., he had occasion to examine one Brenda Clark on March 24, 1970, and as a result of his examination his final diagnosis was attempt rape, patient states she was raped this evening. On physical examination of neck, chest, breast and legs no evidence of injury. Pelvic examination there was a small laceration in introitus, posterial vaginal wall, also tears of the hymen, about three o'clock and some fresh bleeding."

Defendant's age was stipulated to be twenty-eight years and the State rested its case.

Reverend Mattie Johnson, testifying on defendant's behalf, stated that she resided in the apartment directly below defendant's. Reverend Johnson indicated that she was sitting in her living room near the front window from 6:00 P.M. to 8:00 P.M. on March 24, 1970, and was reading her bible. She had noticed the defendant arrive earlier, about 5:30 P.M., but did not see Brenda Clark enter or leave the building during that time period. She did, however, see Brenda's aunt leave about 7:30 P.M. She also saw "a lot of people going up there [to defendant's apartment]" sometime after 8:00 P.M.

Lorene Nelson, Brenda Clark's aunt and defendant's "common-law wife" for eight years, stated that defendant came home from work about 5:30 P.M. on the day in question. She indicated that defendant was in the apartment when she left about 7:30 to attend a wake. She returned home about 10:30 P.M. and, in her words, "[W]hen I got there all of my folks was there. My brothers and nephews and my nieces and * * * I asked them what happened. So they said Sunny, Henry, had raped Brenda." She further stated that she questioned Brenda about the incident and that Brenda initially said the rape had occurred at 7:00 P.M., then changed the time to 7:30 P.M. and finally changed it again to 8:00 P.M. Mrs. Nelson also indicated that she did not own a yellow douche bag.

Nancy Dunn, occupant of the apartment which adjoins defendant's, stated that she was home during the entire evening of March 24, 1970, and did not see or hear Brenda Clark enter or leave defendant's apartment that evening. She did not hear defendant's television between 5:00 P.M. and 8:00 P.M. She did notice Mrs. Nelson leave the apartment about 7:30 P.M. She also stated that she shared the bathroom located in defendant's apartment and had occasion to enter defendant's apartment about 8:00 P.M. to use that facility. At that time she observed defendant "sitting on the bed reading, reading the paper." She initially stated that she neither saw nor heard anyone enter defendant's apartment between 7:00 P.M. and 11:00 P.M., but later indicated that Mrs. Nelson

entered about 10:30 P.M. and that there were several others in the apartment at that time.

Mary Lee Jones, defendant's sister, testified that she received a phone call from Lorene Nelson about 11:00 P.M. on the night in question and was informed of the incident. The next day she went to Brenda Clark's home and spoke with Brenda. According to Mrs. Jones, Brenda initially told her that the rape had occurred at 7:30 P.M. but later changed the time to 8:00 P.M. Mrs. Jones asked to see Brenda's clothing, but was shown only a black and white checked coat "with about two little spots, you couldn't tell what kind of spots they was."

Testifying on his own behalf, defendant denied that Brenda Clark was in his apartment between 6:00 P.M. and 10:30 P.M. on the evening in question. He stated that she arrived about 10:30 P.M. in the company of her brothers and nephews. He further indicated that his common-law wife left the apartment about 7:30 P.M. whereupon he went to bed. He denied having put his arm around Brenda Clark, having attempted to have intercourse with her or having offered her money.

The defense rested its case and the State called Officer Pearlie Warren in rebuttal. Officer Warren testified concerning a conversation she had with defendant on March 25, 1970, in the Juvenile Office of the Chicago Heights Police Department. At that time, according to Officer Warren, the defendant indicated that his wife had left the apartment at 7:00 P.M. and that he had been asleep in bed between 7:00 P.M. and 10:30 P.M.

Defendant initially contends on appeal that the evidence was insufficient to establish his guilt beyond a reasonable doubt. Three arguments are advanced in support of this contention: (1) that the prosecution failed to establish that defendant employed force and that the prosecutrix resisted; (2) that there was no immediate outcry by the prosecutrix; (3) that the testimony of the prosecutrix, as compared with defense evidence, was unclear, unconvincing and uncorroborated. Defendant cites a number of prior decisions wherein convictions were reversed because of similar alleged failures in the State's proof. (E.g., People v. Faulisi 1962, 25 Ill.2d 457; People v. Hayes 1968, 93 Ill.App.2d 198; People v. Adams 1969, 115 Ill.App.2d 360.) The State, on the other hand, factually distinguishes those decisions upon which defendant relies and cites a number of authorities which have affirmed convictions on facts similar in part to those of the instant case. E.g., People v. Porter 1966, 70 Ill.App.2d 438; People v. Mays 1962, 23 Ill.2d 520; People v. Mack 1962, 25 Ill.2d 416.

■■ We have carefully examined both the cited authorities and numerous others which bear on the issues before us. Having done so, we must conclude that defendant's first contention is without merit. Defendant suggests that evidence of physical force by a defendant, e.g.,

bruises on the victim's body, and spontaneous outcries by the victim are essential facts which must be proven before a rape conviction may obtain. It is evident, however, that such is not the law. Moreover, it is evident that the degree of corroboration of a victim's testimony necessary to a conviction must vary from case to case. All that must remain constant in every case are the elements of the offense charged, as set forth by statute, and the quantum of proof necessary to support a conviction. Those facts which will, or will not, establish these elements beyond a reasonable doubt will vary as might ages, or places or times. For example, the failure of an alleged rape victim to scream or cry out may be of pivotal importance in one case and quite insignificant in another. So also might a fearful child offer less resistance to an attack than would an adult woman. It is the totality of facts and circumstances which must be carefully examined in each case.

■■ We have so examined and considered the evidence in this case and have kept two important principles in mind throughout our study of the evidence. The first of these is that a reviewing court is charged with a special duty to exercise utmost caution and circumspection in scrutinizing the sum and substance of the evidence upon which a conviction for a sex offense is predicated. This principle, of course, reflects judicial awareness that a female's accusation, often stemming from clandestine circumstances, is easily made, difficult to prove and ofttimes even more difficult to disprove. The second principle of which we have been mindful is that a trial court is in a superior position to judge the credibility of witnesses and weigh their testimony, and a reviewing court will not disturb a trial court's judgment in this regard unless the evidence, on the whole, is so unsatisfactory or insufficient as to raise reasonable doubt of defendant's guilt. We conclude that the record before us is sufficient to establish defendant's guilt beyond a reasonable doubt.

■■ Defendant next contends that the trial court erred by adjudging him guilty of both rape and contributing to the sexual delinquency of a child. We agree. It is readily apparent that both convictions arose from a single act—from exactly the same conduct by defendant—and, thus, we are constrained to reverse the conviction for the lesser offense. (*People v. Duszkewycz*, 1963, 27 Ill.2d 257; *People v. Schlenger*, 1958, 13 Ill.2d 63; *People v. Miller*, 1966, 74 Ill.App.2d 356; *People v. Ritchie*, 1966, 66 Ill.App.2d 302.) The judgment upon the indictment for rape is affirmed. The judgment upon the indictment for contributing to the sexual delinquency of a child is reversed.

Affirmed in part and reversed in part.

GOLDBERG, P. J., and BURKE, J., concur.