THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ABELARDO ROSARIO, Defendant-Appellant.

First District (1st Division)   No. 81—2375

Opinion filed December 6, 1982.

George P. Lynch, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Raymond Brogan, and Rhoda Davis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McGLOON delivered the opinion of the court:

Defendant, Abelardo Rosario, was found guilty of rape after a bench trial in the circuit court of Cook County. He was sentenced to a term of six years. Defendant appeals.

On appeal, defendant contends (1) that he was not proved guilty beyond a reasonable doubt; (2) that the State failed to prove venue beyond a reasonable doubt; and (3) that his right to confront witnesses was violated due to his exclusion from the courtroom on two occasions.

We reverse.

Complainant was 17 years old at the time of the incident. She testified that on January 17, 1980, at 4:30 p.m., defendant picked her up from work to drive her home. She recognized his car immediately because it had been her brother's car, and voluntarily got into it. They drove toward complainant's home. When they were one block from her home they parked. Complainant testified that she told defendant that she did not want to have anything to do with him anymore. He responded, according to the complainant, by suggesting that they have dinner at the Ponderosa Steak House. He had left his wallet in his locker at work so they drove there to retrieve it.

The first act of sexual intercourse occurred in the parking lot of the factory where defendant worked. Complainant testified on direct examination that after defendant parked the car, he said that he was tired of her saying "No" to everything. He started grabbing her, very tightly, and attempted to undress her. They struggled for about 30 minutes, he hit her in the face and succeeded in pulling her pants down and having sexual intercourse with her. Afterwards, he left the car to go get his wallet and returned with two cans of soda pop. When asked whether she made any attempts to leave the car, she explained that it was impossible because she was ashamed of what had happened and she did not know where she was. They began driving

and after about three hours they stopped for gas. Complainant made no attempts to cry out because defendant had threatened not to drive her home if she did and she did not know the route home.

After they started driving again, complainant testified that the defendant pulled over onto the shoulder and stated, "Okay, now you are mine. You can't marry anybody else, you have to do whatever I tell you." She stated that she had to accept the second act of intercourse or he would not take her home. She explained that the second act took place in much the same manner as the first act of intercourse. Defendant was not charged with rape for the second act of intercourse.

Complainant and defendant arrived at the complainant's home at about 1:30 a.m. on January 18, 1980. She testified that her brother and sister-in-law with whom she lived were waiting for her. There is conflicting testimony concerning what happened after complainant arrived home. Complainant, her sister-in-law and defendant were examined and testified through an interpreter. Complainant's brother was occasionally assisted by an interpreter. It is clear that defendant escorted complainant to the door and entered the apartment with her. The complainant's brother and sister-in-law were waiting for her to return home. However, there were five versions of what the complainant said to her brother at the door. The complainant testified on direct examination that she said "I couldn't resist what happened to me. I been [sic] a victim of him. Please call the police." On cross-examination she testified that she said "I've been a victim, he raped me. Please call the police." Complainant's brother testified that the complainant said, "Brother William, please call the police, I was a victim of rape, Mr. Rosario, Raul." When asked what words she said in Spanish, the brother responded in Spanish, which was translated as: "Raul promised me—I lost my virginity, and call the police up." The brother further testified that the defendant said, "I raped your sister" and attempted to dissuade the brother from calling the police by offering him a stereo, money and a television. Complainant's sister-in-law testified that she heard the complainant say, "I have been a victim of rape, of Raul, he lost my virginity."

On cross-examination, complainant testified that the defendant had lived above her brother's apartment where she lived. She denied ever dating defendant, but after being shown photographs of them kissing in public, remembered meeting him at a club and going to a Greek restaurant and the Ponderosa Steak House with him. She admitted that he had been her boyfriend and that he often drove her home from work. She also admitted kissing him.

Complainant further testified that she did not bite, scratch or kick defendant. When asked on cross-examination if the defendant hit her, she said she was not sure.

Testifying on his own behalf, defendant stated that on January 17, 1980, he picked complainant up from work, as he often did. He drove her within a block of her house. This was routine because the complainant's brother did not approve of their dating. Defendant admitted that complainant said she could not see him anymore, but contended that this was due to complainant's fear of her brother's retaliation. Defendant testified that the complainant did not resist his advances; she responded affectionately. According to defendant, complainant stressed that she could not be late or her brother would beat her. He assured her that he would talk to her brother and that they would be able to remain boyfriend and girlfriend.

Defendant further testified that at about 11:30 p.m. they stopped at Sambo's to get something to eat. Defendant left the car running so that the heat would remain on and went into the restaurant, purchased hamburgers and soda pop, and returned to the car where complainant was waiting. Defendant also testified that they stopped at a rest area. After they returned home, defendant walked complainant to her door and walked into the apartment with her. Her brother was furious that she was late and began slapping her. She then exclaimed that it was not her fault because she had been violated.

Complainant's slacks were admitted into evidence. The belt straps and the corner of the pocket were torn. There was testimony that complainant's face was red and swollen, her cuticle was scratched and there was a mark on her arm.

The principal issue on appeal is whether the admitted act of sexual intercourse was proved beyond a reasonable doubt to be forcible and against the will of the complainant.

The Supreme Court of Illinois has held that in order to prove the charge of forcible rape there must be evidence to show that the act of intercourse was committed by force and against the will of the female. While useless acts of resistance are not necessary, if the complainant has use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will. (*People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865; *People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467; *People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.2d 211.) The degree of force exerted by the defendant and the amount of resistance on the part of the complainant are matters that turn on the facts of a particular case. Resistance is not necessary under circumstances where it would

be futile and would endanger the life of the female as where the assailant is armed with a deadly weapon. Likewise, where the complainant is paralyzed with fear or overcome by superior strength of her attacker, proof of physical force becomes unnecessary. *People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865.

Here, as in *People v. Faulisi* (1962), 25 Ill. 2d 457, the evidence is undisputed that defendant had no weapon. In *Faulisi*, the complainant testified that defendant said he would not harm her if she went along with him, but made no other threats of physical violence. In the instant case, defendant made no threats of physical violence whatsoever. Complainant's testimony indicates that she submitted to two acts of intercourse, made no outcries, and did not attempt to escape despite the fact that she was left alone in the car in areas where there were other people around. Her rationale for her behavior was that she did not know where she was and could not communicate.

The first time, defendant left her for a period of five minutes in the parking lot after the first act of intercourse. The factory was open, defendant encountered his boss in the parking lot and got his permission to get his wallet. Complainant's explanation as to why she did not seek help was that she did not know anybody and did not know how to say "help" in English, even though she indicated that she studied English for four years and spoke in English, at times, during the trial. When defendant stopped for gas the attendant came up to the window twice. Complainant stated that she made no outcry because defendant promised to take her home if she remained quiet. On cross-examination, she reiterated that she did not scream or attempt to leave the car at the gas station because she believed she might be in Indiana. Her submission to the second act of intercourse was coerced by further promises to take her home if she accepted.

The instant case is also analogous to *People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865, wherein the Illinois Supreme Court reversed a rape conviction. In both cases, the complainants never mentioned that they cried out or protested or made any efforts to attract attention of others to their alleged predicaments either in the parking lot or throughout the long rides and stops on the streets of Chicago.

■ We believe that complainant had sufficient control over her faculties and physical powers to seek assistance, yet failed to do so. The failure to exercise an opportunity to escape or summon assistance was a significant factor in reversing the convictions in *People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865, *People v. Qualls* (1961), 21 Ill. 2d 252, 171 N.E.2d 612, and *People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651. We find this factor to be equally signifi-

cant in the instant case. Voluntary submission by a female who has the power to resist, no matter how reluctantly yielded, amounts to consent and removes from the act an essential element of the crime of forcible rape. *People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467, citing *People v. Qualls* (1961), 21 Ill. 2d 252, 171 N.E.2d 612.

We are not unmindful that the complainant made an immediate complaint of rape to her brother. However, here, as in *DeFrates*, the events which preceded the complaint cause it to lose much of its weight. Defendant's actions, escorting complainant to her door and walking into the apartment with her, are hardly those of a man who had just raped a woman. The immediate complaint may be accounted for by the complainant's need to explain her late return. In this regard, the complainant's brother testified that complainant never went out with friends, had never had a boyfriend and stayed in every night after work and over the weekends. Obviously complainant had kept information regarding her social life from her brother.

■ A defendant should not be deprived of his liberty without clear and convincing evidence of his guilt. After a careful review of the entire record which is required of a reviewing court, we are constrained to say that the testimony of the complainant is not sufficiently convincing to lead us to an abiding conviction of the defendant's guilt. Because of our decision of the foregoing issue, it is unnecessary to address the remaining issues raised by defendant.

For the above reasons, we reverse the judgment of the circuit court of Cook County.

Judgment reversed.

CAMPBELL, P.J., and O'CONNOR, J., concur.