THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELIJAH DANIELS, Defendant-Appellant.

First District (5th Division)   No. 83—0919

Opinion filed December 28, 1984.

PINCHAM, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Robert E. McAuliffe, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Timothy J. Joyce, and Brian S. Crowley, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MEJDA delivered the opinion of the court:

After a bench trial, defendant, Elijah Daniels, was found guilty of attempted rape (Ill. Rev. Stat. 1981, ch. 38, par. 8—4) and unlawful restraint (Ill. Rev. Stat. 1981, ch. 38, par. 10—3). The trial court held that the charges merged and defendant was sentenced to five years' imprisonment for attempted rape. Defendant raises a single issue for review: whether he was proved guilty beyond a reasonable doubt. We affirm.

The following facts were adduced at trial. The complaining witness, a 16-year-old girl, testified that around 10 p.m. on October 18, 1982, she was at Pete's Store (Pete's), a video game room located at 3836 West Chicago Avenue. After leaving Pete's, she walked across the street to a store to buy some popcorn. Defendant, who was with a man known to the witness only as Anthony, spoke to her as she

crossed the street. Defendant again spoke to her after she left the store but she did not know what he had said. As she crossed the street, defendant approached her. He was alone. He asked her to go with him, saying he would give her some money if she did so. Complainant replied that she would not go with him. Defendant again asked her to go with him and complainant again refused. At this point, defendant grabbed her right arm tightly, told her to walk with him and not to run, or he would kill her. He then forcibly walked the complainant to a nearby apartment building near the intersection of Chicago and Avers avenues. When defendant opened the door of the building, a woman later identified as defendant's mother, Willie Mae Daniels, was standing inside. Complainant started to tell defendant's mother that defendant had forced her there, but defendant pulled her down the stairs into the basement before she could finish.

Once they were in the basement, defendant took her into a small room which looked like a bedroom. He threw two $5 bills in her face. She let them fall to the floor. Defendant told her he would "get his money back and some pussy too." He then ordered her to take her clothes off. When she refused, defendant again threatened to kill her. Defendant removed his belt, holding the buckle in his hands as if preparing to strike complainant with it. Once more he told her to take her clothes off and once more she refused. Defendant choked her, telling her, "Get in bed. You are going to give me some." He then told her she could not leave until she gave him what he wanted. He choked her a second time and threw her on the bed. After throwing her on the bed, defendant touched her thighs and ripped her sweat shirt while trying to pull it up. Complainant screamed. A man later stipulated to be defendant's brother, David Daniels, came downstairs and told the defendant to stop what he was doing, to which defendant replied that it was none of his business. The two men argued, and Daniels allowed complainant to leave. On her way out, she threatened to call the police. Defendant's mother then attempted to pull her back into the apartment, but Daniels told her to let go of complainant and that defendant deserved it if the police were called. Complainant then ran to Pete's and told the owner, Pete Nichols, that defendant had tried to rape her. She telephoned the police, who arrived a short time later.

Complainant further testified that one evening a few days later, defendant's mother and an older man approached her two or three times offering her $15 or $20 to drop the charges against the defendant. Initially she refused. Defendant's mother then asked her to write a note stating that she would not press charges. Because the two had

been following her that evening frightening her, complainant agreed to write the note but did not accept the money that was offered.

During cross-examination, complainant testified that she did not know the defendant but had seen him in the area. In contrast to an earlier statement that defendant spoke to her before she entered the store to buy popcorn, complainant stated that defendant spoke with her after she left the store. She did not want to go with the defendant but did not scream or tell anyone that she was being forced off of the street. After defendant had taken her to the basement, she screamed when he choked her. She did not scream again after he stopped choking her because she was afraid he would hit her with the belt buckle he was holding. Defendant, however, did not strike her with the belt buckle. Later, she noticed that her neck was swollen.

Complainant further testified on cross-examination that defendant never tried to remove her pants or any undergarments. When questioned regarding an earlier statement given at a preliminary hearing that she was in the building from 10 p.m. until shortly after 11 p.m., complainant stated that she was unable to recall how long she had been in the apartment. The witness denied agreeing to have sex with the defendant for $10 and that defendant could not complete the act and wanted his money back. Complainant denied that she gave defendant $5 back, that he took the other $5, and that she became angry over this. She further denied that she told defendant's mother that nothing had happened. Although she was not threatened into signing the note, complainant signed it because she was scared. Complainant had never had sexual relations with the defendant, and had never taken any money from him.

On redirect examination, complainant testified that she left Pete's at 10 p.m. and that when the police arrived it was around 11:30 p.m. Defendant's age was stipulated to be 27 years.

Pete Nichols, the owner of Pete's Store, testified that at 11:30 p.m. on October 18, 1982, the complainant entered his store looking hysterical and as though she was about to cry. She asked him if she could use the phone. When he asked what had happened, she told him that defendant had tried to rape her. Nichols stated he had known complainant for three or four years and that her reputation in the community was good. His nephew is complainant's boyfriend. On cross-examination, the witness stated that complainant frequents his game room at least four times a week. She stays until 10 p.m., when he requests that his younger patrons leave.

Ronald Smith, testifying on defendant's behalf, stated that he owns Ron's Liquors at 3846 West Chicago Avenue. He observed the

complainant, defendant's mother and brother, Roy Stevenson, together in his bar in October of 1982. Defendant's mother asked him to change a $20 bill. After receiving her change, she gave complainant some money. Smith did not hear any conversation. The three then left the bar. Smith is not related to any of the three but has seen all of them in the area. Complainant often stops in to buy potato chips and pop.

On cross-examination, Smith testified that he has known defendant's mother for 10 years and likes and respects her. Stevenson frequents his tavern almost daily. Last year, he barred the defendant from his tavern.

Anthony French, a good friend of the defendant, stated that he was with the defendant all day on October 18, 1982. He and the defendant saw the complainant before she went into the store to buy popcorn. She asked them to wait for her. Ten minutes later she came out of the store, and they all walked back to the apartment building where both defendant and French reside. French opened his apartment door on the second floor so that complainant could use the washroom. They then went to defendant's apartment on the first floor. Defendant's mother and brother were present in the apartment at the time. Complainant, defendant, and French then went into the basement. While the witness was drinking beer in one room of the basement, defendant and complainant were in another room. He mistakenly walked into this other room and saw defendant and complainant unclothed in bed together. He testified that the two were having sex for about one-half hour. At this point, defendant's brother, David, came downstairs. Complainant then became angry and left because defendant took $5 back from her. On December 6, French saw complainant at Pete's. She told him that she had torn her own sweat shirt. French stated on cross-examination that he knows the whole Daniels family and goes drinking with the defendant.

David Daniels, defendant's brother, testified that around 10 or 10:30 p.m. he was in the basement of his family's apartment. When complainant, defendant, and French arrived, he went upstairs. A short time later he returned to the basement and saw complainant and defendant unclothed in bed having sex. Daniels neither saw defendant choke or hit complainant nor heard her scream. He watched her dress and walked her upstairs to let her out of the building. On the way out she told the witness she was planning to call the police because defendant had taken his money back from her. Daniels testified that Pete's Store was a "whorehouse" and that he had had sex with the complainant for money prior to October 18, 1982.

Defendant's mother, Willie Mae Daniels, testified that on the night in question she answered the door and found complainant, defendant, and Anthony French standing outside the door. As she entered the apartment, complainant in no way indicated that the defendant was forcing her into the basement. Defendant was not holding onto her arm or hand. Complainant went into the washroom first and then down to the basement. Her son David came upstairs when the three went into the basement. Later, the witness heard someone holler, went into the basement and observed the complainant yelling that she was going to call the police. The next evening the witness and her son Roy tried to locate the complainant to find out why she intended to contact the police. When they encountered the complainant at Pete's, complainant told the witness that defendant owed her $15. The three walked to Ron Smith's tavern, where complainant told the witness she did not want defendant arrested and voluntarily signed a note indicating that she would not press charges. Defendant's mother then paid complainant the $15 defendant owed her.

Roy Stevenson, defendant's oldest brother, testified that on October 19, 1982, he and his mother went to Pete's to talk with the complainant. When they arrived at Pete's, his mother asked him to go inside and tell complainant she wanted to speak with her. He did so and complainant asked him to wait for her outside. About five minutes later, complainant came out of Pete's. When his mother asked about the incident of the previous evening, complainant replied that defendant owed her $15. They walked to Ron Smith's tavern, where his mother changed a $20 bill. She asked complainant to sign a note, which complainant did. After his mother gave complainant $15, they left. After hearing all the evidence, the trial court found defendant guilty of attempted rape and unlawful restraint, sentencing defendant to five years in prison. Defendant appeals.

OPINION

The only issue presented is defendant's contention that he was not proved guilty of attempted rape beyond a reasonable doubt because complainant's testimony was not clear and convincing. In a bench trial, the credibility of the witnesses and the weight to be given their testimony is for the determination of the trial court. (*People v. Novotny* (1968), 41 Ill. 2d 401, 411-12, 244 N.E.2d 182.) A court of review will not substitute its judgment for that of the trier of fact when the evidence is merely conflicting. (*People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733.) Accordingly, the trial court's finding will not be disturbed unless the evidence is so unsatisfactory as to

raise a reasonable doubt of guilt. *People v. Catlett* (1971), 48 Ill. 2d 56, 64, 268 N.E.2d 378; *People v. Novotny* (1968), 41 Ill. 2d 401, 412, 244 N.E.2d 182.

Defendant argues that complainant's testimony was not clear and convincing because she failed to cry out when defendant led her down the street, when she spoke with defendant's mother at the front door, and when she was in the house with defendant and others, and because of inconsistencies in her testimony regarding the length of time she was in the apartment building. In a prosecution for rape, the testimony of the complaining witness must be clear and convincing or corroborated by some other facts or evidence. (*People v. Robinson* (1978), 67 Ill. App. 3d 539, 545, 384 N.E.2d 962; *People v. Anderson* (1974), 20 Ill. App. 3d 840, 848, 314 N.E.2d 651.) The significance of a victim's failure to scream or cry out depends on the totality of facts and circumstances of the case. (*People v. Pointer* (1972), 6 Ill. App. 3d 113, 118, 285 N.E.2d 171.) For example, under circumstances where resistance would be futile and would endanger the victim's life, a victim need not resist. (*People v. Smith* (1965), 32 Ill. 2d 88, 92, 203 N.E.2d 879.) Resistance is also unnecessary where the victim is overcome by the superior strength of the assailant or is paralyzed by fear. (*People v. Smith* (1965), 32 Ill. 2d 88, 92, 203 N.E.2d 879.) A child might be expected to put forth less resistance than an adult. *People v. Pointer* (1972), 6 Ill. App. 3d 113, 118, 285 N.E.2d 171.

We do not agree that complainant's testimony was not clear and convincing because she failed to cry out. In fact, the evidence indicates that she did scream. The complainant testified that when the defendant approached her and grabbed her by the arm, he threatened to kill her. He then forcibly walked her to his nearby apartment building. It should be noted that by defense counsel's own admission, the defendant, a 27-year-old male, was much larger than the 16-year-old complainant and was capable of doing almost anything to her. Once they arrived at the apartment building, the complainant started to cry out to the defendant's mother but was unable to finish because the defendant immediately forced her into the basement. While they were in the basement, defendant again threatened to kill her and while choking her for a second time, complainant screamed. Apparently, she ceased screaming only because of her fear that defendant would hit her with the belt buckle he held over her. Defendant's mother also heard complainant screaming and hollering from the basement that she was going to call the police.

A factual situation similar to the instant case was presented in *People v. Sprouse* (1981), 94 Ill. App. 3d 665, 418 N.E.2d 1070. The

complainant, an 11-year-old girl, was sitting on the couch at a friend's home watching television. Defendant was staying at the house. While she sat on the couch, defendant grabbed the victim's feet and put her on his lap. As he carried her into the bedroom, she screamed and hollered. Defendant threatened to kill her, started to fondle her, and attempted to have intercourse with her. The defendant argued that the complainant's testimony that she screamed during the attack was not credible because it was inconsistent with the testimony of other witnesses. This court, however, held that even assuming that the victim had not cried out, that fact did not raise a reasonable doubt of the defendant's guilt under the circumstances, particularly the defendant's threat on the victim's life and the size of the defendant in relation to the size of the complainant. 94 Ill. App. 3d 665, 672, 418 N.E.2d 1070.

Under the present circumstances, the trial court could reasonably have concluded that the complainant offered resistance and that further resistance was unnecessary in light of defendant's threats to strike her and to kill her and his superior physical ability to carry out those threats.

We regard defendant's argument that complainant's testimony was not clear and convincing because of inconsistencies in her testimony relative to the length of time she was in the building as similarly unpersuasive. Clear and convincing evidence is not synonymous with uncontradicted or unimpeached testimony. (*People v. Thompson* (1978), 57 Ill. App. 3d 134, 140, 372 N.E.2d 1052.) Minor inconsistencies in a complainant's testimony do not constitute grounds for reversal. (See *People v. Wright* (1972), 3 Ill. App. 3d 829, 833, 279 N.E.2d 398.) Any discrepancies in a complainant's testimony only affect her credibility. (*People v. Wright* (1972), 3 Ill. App. 3d 829, 833, 279 N.E.2d 398.) In arriving at its decision, the trier of fact must weigh any discrepancies in light of all other testimony presented. (*People v. Wright* (1972), 3 Ill. App. 3d 829, 833, 279 N.E.2d 398.) Where the victim's story is consistent and such discrepancies do not detract from its reasonableness, her testimony may be found clear and convincing. *People v. Thomas* (1960), 18 Ill. 2d 439, 442-43, 164 N.E.2d 36.

The record reveals that the trial court found complainant's testimony very straightforward and credible. We do not think that this discrepancy rendered complainant's version of the incident less reasonable. After having carefully reviewed the record, we agree that complainant's testimony was clear and convincing and find that defendant was proved guilty of attempted rape beyond a reasonable doubt.

For the reasons stated, defendant's conviction is affirmed.

Affirmed.

SULLIVAN, J., concurs.

JUSTICE PINCHAM, dissenting:

There was no attempted rape in this case. There was no unlawful restraint in this case. I therefore dissent.

I do not question the legal principles on which the majority relies in affirming the instant convictions, *i.e.*, "In a bench trial, the credibility of the witnesses and the weight to be given their testimony is for the determination of the trial court. [Citation.] A court of review will not substitute its judgment for that of the trier of fact when the evidence is merely conflicting. [Citation.] Accordingly, the trial court's finding will not be disturbed unless the evidence is so unsatisfactory as to raise a reasonable doubt of guilt. [Citation.] ***. The significance of a victim's failure to scream or cry out depends on the totality of facts and circumstances of the case. [Citation.] *** [U]nder circumstances where resistance would be futile and would endanger the victim's life, a victim need not resist. [Citation.] Resistance is also unnecessary where the victim is overcome by the superior strength of the assailant or is paralyzed by fear. [Citation.] A child might be expected to put forth less resistance than an adult. [Citation.]" But these legal principles are designed to promote, not defeat, justice. These legal principles must not be hatches out of which an unjust judgment of conviction escapes reversal.

Certainly, in a bench trial, the credibility of the witnesses and the weight to be given their testimony is for the determination of the trial court, and certainly, a court of review will not substitute its judgment for that of the trier of fact when the evidence is merely conflicting. But these principles do not indelibly chisel the findings of fact of a trial judge or jury in granite, never to be erased or reversed on appellate review. In fact, the law is to the contrary. In *People v. Brown* (1968), 99 Ill. App. 2d 281, 288, 241 N.E.2d 653, this court held:

> "Because of the nature of the crime, *reviewing courts are charged with an extraordinarily high standard of care in examining the evidence in a rape case.* [Citations.] When the charge is denied and the conviction depends upon the testimony of the complaining witness, it must be corroborated by evidence of other facts and circumstances unless her testimony is clear and convincing. [Citations.] *** [A]pplication of the principles set forth above requires that the evidence be subjected to close scru-

*tiny.* [Citation.]" (Emphasis added.)

Additionally, in *People v. Taylor* (1971), 48 Ill. 2d 91, 98, 268 N.E.2d 865, where the defendant was convicted of rape, our supreme court.stated:

> "As summarized in *People v. Faulisi*, 25 Ill. 2d 457, we have held that *reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases*, and it is the duty of the reviewing court not only to consider the evidence carefully but *to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt* and to create an abiding conviction that he is guilty of the crime charged." (Emphasis added.) 48 Ill. 2d 91, 98.

In *Taylor*, as in the case at bar, the complainant was 16 years of age. Also in *Taylor*, as in the case at bar, the defendant was considerably older than the complainant. In *Taylor*, the defendant was 30 years of age and in the case at bar the defendant is 27 years of age. In *Taylor*, as in the case at bar, the defense to the rape charge was consent. It is to be noted that consent was the defense to the allegations of rape in *People v. Szybeko* (1962), 24 Ill. 2d 335, 181 N.E.2d 176, *People v. Symons* (1961), 23 Ill. 2d 126, 177 N.E.2d 185, *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 443 N.E.2d 273, *People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651, *People v. Keeney* (1973), 10 Ill. App. 3d 296, 293 N.E.2d 492, and *People v. Bain* (1972), 5 Ill. App. 3d 632, 283 N.E.2d 701. In each of these cases the reviewing court duteously executed its responsibility to carefully examine the evidence and thereupon reversed the rape convictions because the evidence failed to "remove all reasonable doubt and create an abiding conviction that the defendant [was] guilty of the crime alleged."

In the case at bar, the defendant was charged with and convicted of attempted rape and unlawful restraint. On appeal, he urges for reversal that the evidence failed to establish beyond a reasonable doubt that the act of attempted sexual intercourse was by force and against the complainant's will.

The defendant further contends that he not only attempted to have sexual intercourse with the complainant, but that he in fact did so, but with her consent. A mere cursory review of the brief, 136-page trial transcript of the testimony of the witnesses clearly reveals that the offenses were not established beyond a reasonable doubt and that the evidence miserably fails to create an abiding conviction that the defendant is guilty of the crimes charged. To the contrary, the evidence unquestionably establishes, indeed, beyond a reasonable doubt, that there was *no* attempted rape or unlawful restraint. In addition, the rec-

ord in this case establishes beyond any reasonable doubt that the defendant's conduct of which complaint is made arose out of the defendant's reneging on a volunteered pecuniary sexual agreement between the complainant and the defendant.

This court's review is not confined to just designated portions of the trial record. This court is charged with the duty to "carefully examine" the entire record, which, in this case, reveals that this 16-year-old complainant, on October 18, 1982, the date of the incident, lived at 4330 West Monroe in Chicago. At 10 p.m. that evening she was in Pete's Store at 3836 West Chicago Avenue. Pete Nichols, the owner of this business, testified that the business was called Blue Diamond Heating, Fuel & Oil, that his "major occupation" was the heating business, installation and repair, and that in conjunction with the place where he had his heating business he also had a "game room, video games, Centerpedes, Jaws and two Miss Pacman's."

The record does not reveal the distance from the complainant's home at 4330 West Monroe to Pete's Store at 3836 West Chicago Avenue. However, this court is authorized to take judicial notice that this distance is at least 14 blocks. (See *People v. Fain* (1976), 41 Ill. App. 3d 872, 876, 355 N.E.2d 61, where the reviewing court stated that it could take judicial notice of the fact that all of the events referred to in the record took place within approximately 2½ city blocks.) While no question is raised about this 16-year-old complainant's right to be 14 blocks from home at 10 p.m., the testimony of the defense witnesses certainly presents a viable question about her *purpose* for being where she was.

Although the complainant testified that she was the girlfriend of Nichols' nephew, there is no evidence in the record that she visited Pete's Store to meet or be with his nephew, or that the nephew was, or had ever been, at Pete's Store. More importantly, the complainant testified that she was alone at Pete's Store at 10 p.m. It is to be noted that David Daniels, a defense witness, testified that he knew Nichols and that "he [Nichols] runs a whorehouse" and that "all the young ladies that hang out in his [Nichols'] places, men that want to obtain some sexual intercourse they go there." Daniels also testified that he had engaged in sex with the complainant "for money."

The complainant emphatically denied that she was a prostitute and denied further that her actions were prompted by a pecuniary sex agreement with the defendant. Nevertheless, her other testimonial admissions clearly impeach her denials.

The complainant testified that she left Pete's Store at about 10 p.m., went across the street for popcorn, and that while en route she saw the defendant, "Elias," whom she knew by name. She stated that

the defendant "had a friend standing with him," whom she knew as Anthony (Anthony French). As hereafter pointed out, it is quite significant that the complainant placed French at this scene, and that defense witness French corroborated this testimony. The complainant also testified that she did not understand what the defendant said in French's presence to her as she was crossing the street to purchase the popcorn, but that after she made her purchase and left the store, the defendant came over to her. The complainant stated that the defendant was alone at that time because French had "gone the other way." The complainant testified that the defendant then told her to "come and go with him, that he would give me some money," and that she said no. Again, it is significant that the complainant testified that the defendant offered her money. A review of case law reveals that it is exceedingly uncommon for an offender bent on rape to offer his potential rape victim monetary compensation.

The complainant testified that when she twice rejected the defendant's dual offers to "go with him for money," the defendant grabbed her arm and told her "to walk with him, don't try to run" or he would kill her. She walked with the defendant around the corner to a two-apartment building. The evidence established that the defendant resided in one of the apartments with his mother, brothers, nephews and nieces. Remarkably, Anthony French lived there also!

The complainant further testified that the defendant, unarmed, with force and against her will, compelled her to walk down Chicago Avenue and then down Avers Avenue to his home. The complainant demonstrated to the trial court how the defendant held her by her arm en route to his home, but the record does not reveal whether the defendant had an ursine grip while dragging her, as she protested, along these public thoroughfares.

Anthony French, whom the complainant placed at the scene where she was allegedly accosted by the defendant, testified that at the defendant's request, after the complainant entered the popcorn store, he loaned the defendant $5. When the complainant left the store, French accompanied the complainant and the defendant to the defendant's home at 820 North Avers. French said that he lived on the second floor, and that the defendant and his family lived on the first floor and basement. According to French, while en route the defendant did nothing to the complainant.

It is the testimony of this complainant that the defendant, whom she knew by name, after twice offering her money for sex, which she rejected, while unarmed, with force and against her will, compelled her to accompany him down public streets in Chicago to his home, where

he resided with his mother, brothers, nephews and nieces, to rape her.

The reviewing court aptly stated in *People v. Taylor* (1971), 48 Ill. 2d 91, 98, 268 N.E.2d 865, that "[T]he degree of force exerted by the defendant and the amount of resistance on the part of the complaining witness are matters that depend upon the facts of the particular case." In *People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651, the rape complainant testified that she was near the intersection of Wells and Goethe streets in Chicago when the defendant, whom she did not know, approached her from the rear, placed a hard object against her side, told her he had a gun and would shoot her, placed his hand over her mouth, choked her and forced her across the intersection and into an abandoned building where he raped her. Like the defendant in *Anderson*, the defendant in the case at bar readily admitted the act of intercourse but contended that it was with the complainant's consent. In reversing the trial court's guilty finding of rape, this court pointed out:

> "In the case before us, complainant testified that after she was first accosted by defendant he forced her across the intersection of Wells and Goethe Streets while holding his hand over her mouth to keep her from crying out. On cross-examination she testified that she made no outcry at that time because she was afraid of his gun, and not because he held his hand over her mouth. *It is doubtful that an attacker could brazenly accost a victim in broad daylight, then successfully spirit that victim across an admittedly busy street in a forcible manner without attracting the attention or intervention of anyone. It is also incongruous that complainant would refrain from making an outcry because of fear of defendant's gun, but would not refrain from engaging in a veritable wrestling match* such as she described as occurring between herself and defendant before they entered the apartment building. Further, she stated that during the time she was being forced across the intersection she saw that defendant no longer had anything in his hands but, inexplicably, she did not cry out for assistance." (Emphasis added.) 20 Ill. App. 3d 840, 848-49.

In *Anderson*, the street encounter was between strangers. In the case at bar, the encounter was between acquaintances. In *Anderson*, the complainant testified that the initial encounter was stealthy and threatening. In the case at bar, the complainant testified that the initial encounter was the defendant's overture of money for sex. In *Anderson*, the encounter was in daylight. In the case at bar it was at night. In *Anderson*, the evidence established that the encounter occurred on a

"busy street." In the case at bar, the evidence is silent on the volume of pedestrians or vehicular traffic. In *Anderson*, the complainant contended that the defendant proclaimed, and his conduct indicated, that he was armed with a gun. In the case at bar, the complainant did not suggest that the defendant was armed, or that he proclaimed or pretended to be or that she thought that he was. In *Anderson*, the victim contended that the defendant forcibly took her to an abandoned building for an act of sexual intercourse. In the case at bar, the victim contended that the defendant forcibly took her to the defendant's home for an act of sexual intercourse. In *Anderson*, and in the case at bar, neither victim while en route made an outcry of protestation or a vociferation for assistance.

As stated in the case at bar, the complainant placed French at the scene of her initial encounter with the defendant. She testified that she did not thereafter see French. French testified, however, that he loaned the defendant $5 and accompanied the defendant and the complainant from their initial point of encounter in front of Pete's Store at 3836 West Chicago Avenue to his home at 820 North Avers, where the defendant, his mother, siblings, nephews and nieces lived on the first floor and basement. Of course it was the trial court's province to resolve this testimonial conflict.

There was no conflict, however, between the testimony of the complainant, French, and the defendant's mother, Willie Mae Daniels, regarding the complainant's arrival and entry at the defendant's home. The complainant testified that upon their arrival the defendant opened the door. The evidence does not disclose how or whether the defendant held her or what resistance, if any, the complainant exerted as the defendant opened the door. The complainant, French, and the defendant's mother testified that when the door opened, the defendant's mother was standing inside. The complainant testified on direct-examination:

"Q. When you first got to the apartment on Avers, what happened?

A. Well, he opened up the door.

Q. Who opened the door?

A. Elias.

Q. When he opened the door, what happened?

A. There was a lady standing there. *** I guess it was his mother.

Q. And what happened to you when he opened the door?

A. I was still standing there.

\* \* \*

> Q. Then what happened?
>
> A. Then I started to say to her that he was taking me some — trying to force me some way. He pulled me down the stairs in the basement.
>
> Q. Did the lady say anything to you when you tried to tell her this?
>
> A. No."

This testimony is patently insidious. From this testimony, the case before us is one in which the defendant forcibly took an acquaintance down public streets to his home to rape her, literally in the presence of his mother, whom the complainant testified she knew by name. The complainant testified that the defendant took her downstairs to the basement before she could protest to the defendant's mother. This is ludicrous. This absurd testimony is not enhanced by this court's statement that "[t]he complainant started to cry out to the defendant's mother but was unable to finish because the defendant immediately forced her into the basement."

It is the complainant's testimony that she did not utter one word either to the defendant's mother or otherwise as she entered the apartment building and, ultimately, the basement of the building. More importantly, the State's evidence completely fails to establish any plausible explanation for her failure to cry out to the defendant's mother, except that she was there, freely and voluntarily, as the defendant contended, to ply her trade.

In *People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651, the complainant testified that as the defendant forced her into the abandoned building, he conversed with a man who was standing at the entrance. The complainant in *Anderson* testified further that she observed another man in the abandoned building during the time when the defendant repeatedly raped her. She stated that she did not make an outcry to either man because they were black, as was the defendant, that they seemed to have known the defendant, and because she believed that neither man would help her. As fallacious as this explanation is, it is far more plausible than the complainant's explanation in the instant case for her failure to make an outcry or protestation to the defendant's mother, whom she knew.

In *Anderson*, this court resoundingly repudiated the complainant's unorthodox explanation for not lamenting her predicament to the two men whom she saw. We stated in *Anderson*, "[The] complainant had sufficient control over her faculties and physical powers to request assistance from those individuals, yet did not do so. Justification for failing to make an outcry to a potential intervenor because that person

was of the same race as the attacker was rejected in *People v. Qualls* (1961), 21 Ill. 2d 252, 171 N.E.2d 612." 20 Ill. App. 3d 840, 849.

The complainant's heretical reason in the case at bar for not crying out to the defendant's mother should be just as emphatically rejected. As this court further stated in *Anderson, "The failure to exercise an opportunity to escape or summon assistance was a significant factor in the reversal of [rape] judgments of guilty in both Taylor and Qualls ***."* (Emphasis added.) *People v. Anderson* (1974), 20 Ill. App. 3d 840, 849, 314 N.E.2d 651.

And as this court pointed out in *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 1024, 443 N.E.2d 273 (citing *People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865, where the Illinois Supreme Court reversed the rape conviction), "In both cases, *the complainants never mentioned that they cried out or protested or made any efforts to attract attention of others to their alleged predicaments ***."* (Emphasis added.) This court's reasoning in *Rosario* and *Anderson* should also be applied to the instant case.

Money for sex is the common thread throughout the complainant's testimony—from the defendant's initial street encounter to the basement of the defendant's home. The complainant testified that upon entering a bedroom in the defendant's basement, the defendant threw some money in her face, two $5 bills, that she let them fall to the floor, and that the defendant then said that he "would get his money back and some pussy too." It is nothing less than preposterous that the defendant would force the complainant past his mother to a bedroom in his home, throw the complainant $10, which she refused, and then say to her that he would "get his money back and some pussy too."

The complainant testified further that she refused the defendant's demand to disrobe, that the defendant took off his belt "and had it with the buckle end like he was fixing to hit me with it," that the defendant choked her, felt her thighs, tried to pull her blouse up and slightly ripped it, that the defendant did not attempt to pull off any of her garments, and that the defendant did not strike her at any time.

David Daniels, the defendant's brother, testified that he was in the basement, lying in a bed, when the complainant, whom he knew by name, and the defendant arrived. Daniels got up and went upstairs. When he returned, he observed that the complainant had disrobed. He thereafter saw the complainant get dressed. Anthony French testified that he went into a room in the basement, and that later while looking for a match, he mistakenly entered the bedroom and saw that the complainant and the defendant were nude in bed and engaged in sexual intercourse.

The complainant testified that she resisted the defendant's lupine sexual impulses. But the testimony of French and Daniels confirmed that she did *not* resist and that her sexual participation was consensual. It was the duty of the trial judge to resolve this evidentiary conflict. In so doing, however, he was obligated to exercise rational judgment and reasoning, and to consider other evidence in the case, such as Daniels' testimony that after witnessing the complainant put her clothes back on, he "took her upstairs and let her out the door." Daniels testified further:

"Q. Why did you take her upstairs?

A. Because they had finished doing what they wanted to do, and he had took—she had some money. He had some money that he had got back from her. So, after they finished, I personally walked upstairs and took her to the front door.

Q. Did she say anything to you?

A. *She said that she was going to call the police.*

Q. *Did she say why?*

A. *Because he took his money back from her.*" (Emphasis added.)

French testified that after mistakenly walking into the bedroom in which the complainant and defendant were nude in bed, engaged in sex, he left the room. He testified further:

"Q. How long were they having sex in that room?

A. Well, I know I was out of the room for awhile. So, I was—I would say about twenty or thirty minutes.

Q. All right, did anything happen?

A. The only thing I know, you know, his brother, David, had come downstairs.

* * *

Q. And then what happened?

A. So, she got mad. She left there, because he had took his money back, his five dollars back.

Q. Who had taken his money back?

A. Elijah."

Willie Mae Daniels, defendant's mother, testified that on the day of the incident, at about 10 or 10:30 p.m., French and the complainant came to her home at 820 North Avers, that the complainant, whom she knew by name, had been to her home several times previously, that at the complainant's request she gave her permission to use the washroom, and that when the complainant came out of the washroom, the complainant, defendant and French went to the basement. Mrs. Daniels testified further:

"Q. How long were they down in the basement, if you know?

A. Well, I just can't recall, \*\*\*. So, we went down there, and when I heard the noise, whoever hollered. And then I went down there. She was standing there with her clothes on, and Elijah had his clothes on, and Anthony French was standing up there too. She was hollering.

Q. She just hollered down there?

A. 'I'm going to get the police.' That's all she was saying. She had her clothes on. The State's Attorney called me that night on the phone and asked me did she have their clothes on or off. I said that they had their clothes on, which they did."

The fact that the defendant's brother, mother and French readily admitted that the complainant made vociferous protestations and threats to call the police as she departed enhances the credibility of their testimony. The complainant corroborates their testimony. She testified that because of her protestations to the defendant, the defendant's brother, David Daniels, came downstairs and that as she departed, she said she was going to call the police. The complainant also stated that the defendant's mother tried to pull her back, that David told Mrs. Daniels to let her go, and that if she called the police "he deserved it."

Did the complainant depart to call the police because the defendant attempted to have sex with her by force and against her will, or did she depart to call the police out of her revenge instigated by the defendant's reneging on his promise to compensate her for an act of sexual intercourse, as David Daniels and French testified? From the totality of the evidence, the complainant departed to make an invidious call to the police out of revenge and not because she was a criminal sex victim.

Mrs. Daniels and her eldest son, Roy Stevenson, testified that on the following day they sought and found the complainant at Pete's Store and that in response to their inquiry as to why the complainant wanted to call the police, the complainant exclaimed that it was because the defendant owed her $15. Mrs. Daniels, Stevenson and the complainant then went from Pete's Store to Ron Smith's tavern, where the proprietor, Ronald A. Smith, changed a $20 bill for Mrs. Daniels. Mrs. Daniels gave the complainant the $15 the complainant claimed the defendant owed her. The complainant then signed a note that she "didn't want to have anything to do with it anymore."

Smith corroborated Mrs. Daniels' and Stevenson's testimony that Mrs. Daniels gave the complainant $15. Smith also testified that "\*\*\* Mrs. Daniels came up to the bar and asked me to change a twenty dollar bill for her. I changed the twenty dollar bill for her, and then she

walked over to the phone where Roy [Stevenson] and [the complainant] were standing, and she handed [the complainant] the money. *** The three of them walked out the door."

The complainant's testimony persuasively corroborated Mrs. Daniels', Stevenson's and Smith's testimony that the complainant was given $15. The complainant initially denied that she was ever in Ron Smith's tavern with the defendant's mother. She later admitted, however, that she was there. The offer of money permeated even this aspect of her testimony. The complainant testified that Mrs. Daniels offered her "$15 or $20 to drop the charges," and that she told Mrs. Daniels no. Apparently, because this complainant knew that Mrs. Daniels had the note that the complainant had written, the complainant admitted that she wrote it, but said that she did so because she was afraid, even though no one threatened or even talked "nastily" to her.

First, if Mrs. Daniels offered the complainant $15 or $20 to drop the charges, this conduct constituted an attempt to bribe a witness, a criminal offense, on which the prosecuting authorities took absolutely no action. Ill. Rev. Stat. 1981, ch. 38, par. 32—4(b).

Second, a $15 or $20 offer to "drop" an attempted rape and unlawful restraint charge would appear to be quite meager. Surely the amount would have been substantially larger if offered to bribe her not to testify.

Third, the $15 or $20 amount that the complainant contends was offered her by the defendant's mother is extraordinarily compatible with that amount the defendant contended was in controversy between him and the complainant.

Fourth, it would appear that there was no credible reason for Mrs. Daniels, Stevenson and Smith to testify that the complainant accepted the $15 and wrote the note if in fact the complainant rejected the money and wrote the note because she was afraid. Conversely, there is a viable motive for the complainant to deny accepting the $15—an admission by her would have corroborated the witness' testimony that her controversy with the defendant was over a debt for sex.

The complainant fulfilled her departing threat to the Daniels to call the police. She testified that she went to Pete's and called the police, who "came quick." Pete Nichols testified that at approximately 11:30 p.m. the complainant entered his store and asked to use his phone, that he asked the complainant what happened, and that she told him that the defendant had tried to rape her.

This 11:30 p.m. hour that Nichols and the complainant testified that the complainant called the police is extremely momentous. The complainant testified that at 10 p.m. the defendant accosted her on

Chicago Avenue and walked her around the corner to his home. Her version of the evening could not have consumed an hour and a half, to 11:30 p.m., when she called the police. She testified on redirect examination:

"Q. How long did this entire incident happen from the time that the defendant first grabbed your arm and had you go with him until you had run back to Pete's Place? About what time did you say that occurred?

A. When I left out of Pete's at exactly ten, and when I got back, it was when the police arrived. It was about 11:30."

The hour and a half the complainant admitted spending with the defendant and the 11:30 p.m. hour she admitted calling the police are in greater accord with the *defendant's* corroborated evidence of consensual sex than the complainant's uncorroborated testimony of attempted forceful sex. The complainant's testimony lacks verisimilitude. It is not persuasive and convincing. It is uncorroborated and fails to create an abiding conviction of the defendant's guilt.

The complainant's statement to Nichols and her telephone call to the police do not corroborate her testimony of attempted rape any more than they corroborate the defendant's evidence of agreed sex for money and the complainant's reprisal because of the defendant's partial payment.

In *People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651, the complainant testified that after the defendant raped her, she immediately departed from the abandoned building where the act occurred. The complainant said that she then saw two police officers, whom she promptly informed that she had been raped, and that she was taken to a hospital where she was given a medical examination. This court was unpersuaded by this testimony and held, "We do not find in the record sufficient independent evidence in corroboration to afford a basis for sustaining the judgment of guilty on the charge of rape," and that "[a]fter the careful scrutiny of the State's evidence which is required of a reviewing court, we hold that evidence insufficient to remove all reasonable doubt and to create an abiding conviction that the alleged acts of intercourse engaged in by complainant and defendant were performed by force and against her will." 20 Ill. App. 3d 840, 849-50.

In *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 443 N.E.2d 273, when the defendant took the 12-year-old complainant home she immediately protested to her brothers that the defendant had raped her. This court rejected the complainant's prompt outcry as corroborative of rape, stating, "The immediate complaint may be accounted for by the complainant's need to explain her late return." (110 Ill. App. 3d

1020, 1025.) In the case at bar, the complainant's immediate complaint is accounted for by her anger. It, too, should therefore be rejected as corroborative of attempted rape.

Our supreme court reversed the robbery and rape convictions in *People v. Rossililli* (1962), 24 Ill. 2d 341, 181 N.E.2d 114, in which the defense was consent. The language of the court in *Rossililli* is most applicable to the case at bar:

> "Our duty in reviewing the record of judgment of conviction in a criminal case was stated in *People v. Dougard*, 16 Ill. 2d 603, where it was said, page 607. 'We have consistently held in many cases over a long period of years that in criminal cases it is the duty of this court to review the evidence, and, if there is not sufficient credible evidence, or if it is improbable or unsatisfactory, or not sufficient to remove all reasonable doubt of defendant's guilt and create an abiding conviction that he is guilty, the conviction will be reversed. It is the duty of this court to resolve all facts and circumstances in evidence on the theory of innocence rather than guilt if that reasonably may be done, and where the entire record leaves us, as this one does, with grave and substantial doubt of the guilt of the defendant, we will not hesitate to reverse the judgment.' " 24 Ill. 2d 341, 345-46.

In the instant case, substantial doubt of the defendant's guilt is further presented because the complainant's "torn" sweat shirt did not corroborate her testimony. She testified that "it was torn a little bit already, and he pulled it and just ripped [it] some more." The complainant exhibited the shirt to the trial judge "where it was that [she] said it got torn." The complainant did not specify where the defendant allegedly tore her shirt. French testified, however, that he talked to the complainant after the incident and that the complainant told him that she was angry, that she went to Pete's Store, called the police and that she tore her blouse off herself.

In *People v. Rosario* (1982), 110 Ill. App. 3d 1020, 443 N.E.2d 273, the complainant's slacks were admitted into evidence. The belt straps and the corner of the pockets were torn. There was testimony that the complainant's face was red and swollen, her cuticle was scratched, and that there was a mark on her arm. This court held that this evidence did not elevate the act of sexual intercourse from one of consent to one of force. Similarly, the complainant's previously ripped sweat shirt in the case at bar does not elevate the act of sexual intercourse from one of consent to one of force either.

Additionally, it is apparent that the trial judge in this case did not properly assess the credibility of the witnesses and that he was improp-

erly influenced by his own impression of matters outside the record in finding the defendant guilty. When rendering his verdict, the trial judge stated:

> "Well, what we have here is possibly the oldest defense in the world. There is a sixteen year old victim who is a prostitute. She was mad. She hollered. Well, in this case, attempt rape instead of rape."

The age of the defendant's defense or its use throughout the world should not have had any bearing on the trial court's determination of the credibility of the witnesses or its assessment, acceptance or rejection of the defendant's defense. For this reason alone, the defendant's conviction should be reversed.

Next, this court's reliance on "defense counsel's admission" that "the defendant, a twenty-seven-year-old male, was much larger than the 16-year-old complainant and was capable of doing almost anything to her," was also inappropriate. First, this statement was made by defense counsel in his argument to the court in support of his motion for a finding of not guilty at the close of the State's case on the ground that the State's evidence failed to establish beyond a reasonable doubt that the defendant had taken a substantial step towards the commission of an attempted rape. Ill. Rev. Stat. 1981, ch. 38, par. 8—4(a).

Second, defense counsel's argument on behalf of his client cannot be raised to the level of competent evidence to be relied on by the reviewing court to affirm defendant's conviction on appeal.

Finally, this court's reliance on *People v. Sprouse* (1981), 94 Ill. App. 3d 665, 418 N.E.2d 1070, is misplaced. In *Sprouse*, the defendant admitted pulling the 11-year-old complainant across the bed while she was kicking him. When asked if he attempted "to play with her vaginal area," the defendant responded, "If it was tipped it was accidently." Furthermore, in *Sprouse* the defense to attempted rape was not and could not have been consent because the complainant was only 11 years old and therefore legally incapable of consenting. (Ill. Rev. Stat. 1979, ch. 38, par. 11—4(a)(1).) *Sprouse* is factually and legally inapposite to the case at bar.

For the reasons stated, the defendant's conviction should be reversed.